644 So.2d 1199 (1994)
John DOE
v.
Mary DOE.[1]
Nos. 90-CA-01236, 92-CA-00275.
Supreme Court of Mississippi.
October 27, 1994.
*1200 Thomas Q. Brame, Jr., Bay Springs, for appellant.
Dannye L. Hunter, Jackson, for appellee.
En Banc.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION

This case involves the termination of visitation rights as a result of allegations by Mary Doe that John Doe had sexually abused their minor daughter during his visitation periods. The two separate causes  two motions to modify judgment  were consolidated for purposes of this appeal. This Court finds it necessary to address only the following issues:
A. Whether the chancellor committed manifest error in determining that certain hearsay statements, purportedly made by a three year old child declarant, which implicated John Doe as the perpetrator of the child's sexual abuse, were admissible;
B. Whether the chancellor committed manifest error in determining, during the first hearing, that the minor child had been the victim of sexual abuse;
C. Whether the chancellor committed manifest error in suspending all visitation rights of John Doe with his minor daughter; and
D. Whether the chancellor committed manifest error in awarding attorney fees to Mary Doe in both of the two hearings.
Although Mary filed notice of a cross-appeal in cause number 90-CA-1236, the only issue she raises which differs from those raised by John on direct appeal is:

A. Whether Mary Doe is entitled to attorney fees for services of her attorney on appeal.

II. FACTS AND PROCEDURAL HISTORY

Pursuant to the Does' March 1989 divorce decree, Mary was granted custody of the parties' minor daughter, Jane, who was almost three years old at the time; John was granted reasonable visitation rights. John subsequently remarried. Mary, John, and Lois, John's current wife, enjoyed a cordial relationship for some time, with John exercising the visitation granted him, as well as extra visitation with Jane, to which Mary did not object.
Mary Doe then filed a motion to modify the judgment, the basis for appeal No. 90-CA-1236. Claiming a substantial and material change in circumstances adverse to the parties' minor child (sexual abuse of the child during visitation with John Doe), Mary sought to have John's visitation rights extinguished. Mary further requested that John be ordered to pay all medical and therapy expenses related to the sexual abuse for the *1201 parties' minor child. The chancellor issued a Temporary Restraining Order (TRO), pending hearing of Mary's motion, which suspended John's visitation rights.[2] At this point, Chancellor David Clark recused himself and, on agreement of the parties and their attorneys, appointed John Clark Love, Jr., Special Chancellor. This appointment was certified by this Court.

A. FIRST HEARING

In 1989, after Jane had returned from visitation with John that Labor Day weekend, Mary and her mother, Beth Smith, were in Beth's bedroom when Jane came in, took off her shorts and panties, lay spread eagle on the floor, and said "Mommy, do you want to lick me like my daddy does?" Mary saw that Jane's genital area was red and raw. When Jane told Mary "Daddy tried to hurt my cootie brown, but he hurt Lois's instead," Mary took Jane to the emergency room, where she reported her suspicions of sexual abuse. Jane was examined by Dr. Carney, the emergency room physician. On another occasion, in September of 1989, Jane exhibited bizarre behavior of an arguably sexual nature. While at Mary's parents' home, two of Mary's brothers were wrestling on the floor; the older playfully threatened to pull down the younger brother's pants. Jane asked "do you want me to lick you?"
On Thursday, March 8, 1990, Mary consented to extra visitation at the request of John and Lois. John and his father, Don Doe, took Jane to the fox pen, where they spent the night. John testified that none of the people present at the fox pen had harmed Jane in any way.
The weekend of March 17-18, 1990, was John's regular visitation period. He and Lois requested that they be allowed to pick up Jane on Thursday rather than on Friday; Mary agreed. Mary bathed Jane about 6:30 that Thursday evening, noticing nothing abnormal about Jane's genital area. Lois picked up Jane at Mary's home at about 7:00 p.m. Thursday, and took her to the fox pen, where John and his father, Don Doe, had gone to fox hunt.
When Lois bathed Jane on Friday evening, she noticed that her vaginal area was red, so she applied baby powder. The following day, Lois applied more powder when she saw that Jane was still red. Lois told Mary about Jane's condition when she and John took the child home on Sunday. When John and Lois left, Jane told Mary her "cootie" hurt. Mary took Jane inside to bathe her, but when she put Jane in the bathtub, Jane "hopped up and grabbed herself between her legs and she went to screaming." Jane said "The boogey man done it, he bited me and scratched me and he pushed me down." Mary examined the child and found her genital area swollen and cherry red.
Mary enlisted the aid of her mother, Beth Smith, to get Jane calmed down. When Mary and Beth had no success, Mary phoned Dr. Clark in Morton, who recommended Mary take the child to the emergency room at Lackey Hospital. Dr. Carney, the emergency room physician, examined Jane that evening and told Mary to contact the Welfare Department because there was no doubt in his mind that Jane had been sexually molested. Dr. Carney diagnosed Jane as suffering from cystitis. The next morning, Dr. Carney phoned the Scott County Department of Human Services and reported that he suspected sexual abuse of Jane Doe.
On Monday morning, March 19, 1990, Mary took Jane to see Dr. Howard Clark, as recommended by Dr. Carney.[3] Dr. Clark's examination of Jane revealed a red, raw, and swollen vulva; redness from the vulva up to the pubic area; urinalysis was normal, eliminating the possibility that Jane's symptoms were caused by cystitis or urinary tract infection, and there was no indication that the introitus had been penetrated. Dr. Clark was of the opinion that Jane's condition was caused by a trauma of some type. The signs of such a trauma could last three to five days from the time of trauma, depending upon treatment.
*1202 Mary, again on Dr. Carney's advice, went to the Department of Human Services. The Department scheduled an appointment for Jane with Dr. Julia Sherwood, a Jackson pediatrician. Dr. Sherwood's report, based on her examination of Jane on March 22, 1990, contained no findings of sexual abuse or trauma.
Mary began taking Jane to Brenda Chance, a licensed clinical social worker specializing in the area of child psychotherapy, for professional therapy. Chance conducted an evaluation to determine whether the child had been sexually abused, by whom, and whether treatment was necessary. Brenda Chance was qualified as an expert at this first hearing. Jane, four years old at the time, told Chance that she played in her Daddy's bedroom when at his house, and sometimes they went to the fox pen. Jane didn't know whether she liked going to the fox pen; she just said she gets sleepy. Using dolls, Jane discussed various body parts and their functions. Chance related that Jane talked about a boogey man touching her in her genital area when she was turkey hunting with her daddy.
John denied ever having abused Jane, although he said he believed she had been "sexualized." At Chance's request, Dr. Charlton Stanley, a psychologist, performed a psychological evaluation on John Doe to determine whether he exhibited any characteristics of a possible sex offender. John's test results cross-validated each other and revealed no problem to treat. John was within the normal range regarding sexual obsessions or fetishes or sexually deviant interests. The only area in which Stanley felt counseling was needed was parenting, because John suffered more stress than the average parent. Dr. Stanley's report reveals that John reported some arguably deviant sexual behavior on Mary's part during the couple's marriage.
After another seven visits, during which Jane alternately made statements implicating her father and other relatives and friends and recanted these same statements, Chance determined that Jane had been sexually traumatized. Although Chance found Jane's knowledge of body parts was not uncommon, her knowledge of adult sexual behaviors was not normal. Chance did not, however, reach a conclusion regarding who the perpetrator was. She did express reservations about Jane's continued visitation with John, with or without supervision, because of the psychological impact it could have upon the child. Chance also testified that Jane would need additional therapy, possibly for as much as another year.
Between Jane's last visit with Chance and the date of the first hearing, John had exercised his supervised visitation rights with Jane a number of times, pursuant to the amended TRO, in the Scott County Department of Human Services office. After one of these visits with John, Jane reportedly told her mother "I'm not going to talk to that judge because my daddy told me not to or he'll hurt me worse and worse and worse." Paulette Hall, a social worker with Scott County Department of Human Services, testified that she had observed affection rather than fear when John exercised his visitation with Jane at the Department. Mickey Jones, a child abuse investigator with the Department, corroborated Ms. Hall's testimony.
After this first hearing, the special chancellor modified the former final judgment on October 18, 1990, restricting John's visitation with Jane and requiring John to pay the cost of further treatment and therapy for Jane. The special chancellor found the child had been sexually abused, but did not find sufficient evidence to determine that John was the perpetrator of such abuse. The order also conditioned John's visitation rights on compliance with the other terms of the order. John was further ordered to pay Mary $3,400.00 as a portion of her attorney fees, payable in $200.00 monthly installments. John subsequently filed a notice of appeal; Mary filed a notice of cross-appeal. At this point, Jane's treatment with Brenda Chance resumed.

B. SECOND HEARING

Forming the basis for appeal No. 92-CA-275, Mary next filed a motion to modify judgment and for contempt. Alleging a material change in circumstances adverse to the parties' minor child, Mary sought to have *1203 John Doe's visitation rights extinguished and to have him enjoined from any contact or communication with the minor child. As the basis for contempt, Mary alleged that John, in violation of the previous court order, had failed to make a $200.00 payment toward her attorney fees and, further, that he had failed to pay the medical expenses and therapy costs for the minor child. John Doe answered and filed a counter-complaint for contempt, based on Mary's refusal to allow John's court ordered visitation with the minor child. John then moved for production of the minor child for examination and evaluation, which Mary opposed. John also sought a preliminary injunction.
Several witnesses testified at the June 7, 1991, second hearing on John's motion for independent evaluation of the child. Paulette Hall, a social worker with the Department of Human Services (DHS), was qualified as an expert in the field of child sex abuse. Ms. Hall had observed John's visitation with Jane at the Department and testified that the pair appeared to have a loving relationship, exhibiting appropriate behavior. Ms. Hall formed the opinion that Jane had been emotionally and mentally abused, but not sexually abused. She did not think further evaluation of Jane by professionals would be detrimental to the child.
Mickey Jones, a child abuse investigator with the Department, also testified that the visitation he supervised between Jane and John revealed no fear on Jane's part.
Dr. Jan Boggs, a psychologist and counselor, was also qualified as an expert in the field of child sexual abuse. Dr. Boggs said that John and Mary both needed to be involved in the evaluation of Jane; that another independent evaluation should be obtained on Jane and that this would not be detrimental to the child; that it was not unusual for a child victim of sexual abuse to need considerable time and therapy before understanding what has happened to her; and that John was apparently randomly selected by Chance, from over a dozen names Jane had supplied, as the perpetrator of her sexual abuse.[4] Dr. Boggs felt Chance's evaluation and therapy of Jane was inadequate and improper. Assuming John had abused Jane, Dr. Boggs found John to be a good candidate for rehabilitative treatment.
Due to Jane's emotional state, her psychiatrist, Dr. Guild, admitted the child to Charter Hospital on November 4, 1990, where she remained in treatment until November 20, 1990. After Jane was discharged from the hospital, she had another 15 to 18 sessions with Chance. Since the hospitalization, Chance said Jane had consistently named John and his father, "Papaw Don," as perpetrators of her sexual abuse and of other threatening incidents that occurred at the fox pen. However, Jane also continued to name others as perpetrators of her sexual abuse. Chance stated that evaluation of Jane by another expert would be detrimental to the child and, in only six or eight sessions, as suggested by Dr. Boggs, not enough trust would develop to make the evaluation worthwhile.[5] Chance felt that Jane's testifying in court would be emotionally distressing to her, whether in John's presence or not.
John again testified that he had never had any sort of inappropriate contact with Jane, and neither had anyone else when Jane was in his custody. John said he and Jane had a good relationship before his visitation rights were terminated and he felt he could reestablish this relationship with Jane.
The chancellor examined Jane in chambers to ascertain whether she exhibited any fear of her father, whether her mother had instructed her as to the statements she had made, and whether a discussion would upset her. Jane said she did not want to visit with her father, but did not mention any sexual abuse. The chancellor noted no fear of John. Jane said she didn't want to see John because her mother told her he was on drugs, and because John is mean and whips her. Jane also said her mother didn't want her to visit with John. Jane said her mother told her Papaw Don and Lois Doe "do" drugs. *1204 At the close of the hearing the chancellor authorized an independent evaluation of Jane Doe.

C. THIRD HEARING

Mary then filed a motion for relief from judgment pursuant to M.R.C.P. 60(b)(3), claiming that since the court's last judgment restricting John's visitation with Jane, Mary had discovered that John was Jane's sexual abuser.[6] Mary requested that John's visitation with the minor child be extinguished. John filed his own motion for relief from judgment.
At the January 29, 1992, hearing on the motions for relief from judgment, Dr. Jan Boggs reported that Jane told him nobody had ever hurt her or done anything to her they shouldn't have; that her mom said not to mention her dad; that no one had ever told her to say she had been touched by anyone; that she had never touched anyone in a private place, nor had anyone asked her to do so. Jane later told Dr. Boggs that John had touched her in a private place with a bad touch. Jane said nobody was around when John did this; she wouldn't use a doll to show what John had done.[7] According to Dr. Boggs, Jane did not exhibit any emotion in making these statements. Dr. Boggs was not satisfied that many of Jane's statements implicating her father were spontaneous.
Dr. Boggs concluded that Jane had not been sexually abused; that the degree of validity of statements made by an abused child is greater when the statements are made closer in time to the event; and that Jane was not able to provide details in response to open-ended questions. Even in cases of sexual abuse, according to Dr. Boggs, such complete alienation of the parent/perpetrator as Jane exhibited toward John was extraordinary. Dr. Boggs said resumption of visitation with John would not traumatize Jane.
Brenda Chance reported that Jane continued to express fear of her father and did not want to see him. Jane told Chance "My daddy said he would kill me if I told about having sex with me." Jane said that her daddy had "used the bathroom in my mouth." Since the second hearing, Jane had only identified her father and her paternal grandfather to Chance as perpetrators of her sexual abuse. Chance was of the opinion that Jane had been sexually abused by John and his father. Chance felt visitation with John would be detrimental to Jane. In Chance's opinion, Jane's best interests would be served by no further contact with John.
Paulette Hall was still of the opinion that Jane had not been sexually abused. John still denied any inappropriate conduct with Jane.
Following this hearing, the special chancellor entered an order granting Mary relief from judgment and modifying the former judgment. All visitation between Jane and John was suspended and John was further enjoined from any contact with the child. Mary was again awarded a portion of her attorney fees. John's motion for relief from judgment was dismissed with prejudice. Again, John filed a notice of appeal with this Court.

III. THE LAW

A. Whether the chancellor committed manifest error in determining that certain hearsay statements, purportedly made by a three year old child declarant, which implicated John Doe as the perpetrator of the child's sexual abuse, were admissible.

1. The Parties' Contentions
Mary Doe and Beth Smith, Jane's maternal grandmother, testified[8] that Jane returned from a visitation period with her father during Labor Day weekend, 1989, undressed, lay spread eagle on the floor, and *1205 said "do you want to lick me like my daddy does?" Beth's testimony of this hearsay statement was allowed at the second hearing, over objection, pursuant to M.R.E. 803(25), subject to establishment of sufficient indicia of reliability. Brenda Chance's testimony of Jane's hearsay statements, at the first hearing, was allowed pursuant to M.R.E. 803(4), over objection. Chance's testimony at the third hearing, including hearsay statements of Jane implicating John, were also admitted, over objection, pursuant to M.R.E. 803(4). Other hearsay statements implicating John, as testified to by Dr. Boggs, were admitted without objection. During the third hearing, the chancellor found all of these hearsay statements admissible pursuant to M.R.E. 803(25).
John claims the chancellor erred in admitting the hearsay statements at issue because they did not evidence guarantees of trustworthiness as required by M.R.E. 803(4) and 803(25). John also claims Jane was "programmed" by Mary, her parents, and Chance.
Mary claims the chancellor properly allowed admission of Jane's hearsay statements after finding on the record that the statements were made under circumstances substantially indicating their trustworthiness in that the time, content, and circumstances surrounding the statements provided substantial indicia of reliability. Mary also contends that cross-examination would have been of no value, given the reliability of these statements.

2. Relevant Law and Analysis
The admissibility of evidence is largely within the trial court's discretion. Baine v. State, 606 So.2d 1076, 1078 (Miss. 1992) (citing Wade v. State, 583 So.2d 965, 967 (Miss. 1991)). However, where the trial court employed an incorrect legal standard in its fact findings regarding the admissibility of evidence, a broader standard of review is invoked on appeal. Baine, 606 So.2d at 1078.
Effective March 27, 1991, between the first and second hearings, the Mississippi Rules of Evidence were amended to provide that certain types of hearsay would be admissible as exceptions to the hearsay rule. Amended Rule 803(4) and new Rule 803(25) read as follows:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances substantially indicating their trustworthiness. For purposes of this rule, the term "medical" refers to emotional and mental health as well as physical health.
(25) Tender Years Exception. A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

a. M.R.E. 803(4)
This rule allows statements of "causation and fault [and] has been expanded to include the identity of the perpetrator in child abuse cases." Jones v. State, 606 So.2d 1051, 1056 (Miss. 1992) (citing Robert P. Mosteller, Child Abuse and Statements for the Purpose of Medical Diagnosis or Treatment, 67 North Carolina Law Review 257, 264 (1989). See also Mitchell v. State, 539 So.2d 1366 (Miss. 1989)).
Before admitting evidence pursuant to M.R.E. 803(4), a two-part test must be met: "the declarant's motive in making the *1206 statement must be consistent with the purposes of promoting treatment; and ... the content of the statement must be such as is reasonably relied on by a physician in treatment." Jones v. State, 606 So.2d 1051, 1056 (Miss. 1992) (citing U.S. v. Renville, 779 F.2d 430, 436 (8th Cir.1985)). Statements by a child sexual abuse victim identifying the perpetrator as a member of his/her household "are reasonably pertinent to treatment" and are reasonably relied upon by physicians in diagnosis and treatment. Jones, 606 So.2d at 1056-57.
The chancellor admitted Jane's statements as testified to by Brenda Chance pursuant to M.R.E. 803(4). The chancellor made no on-the-record findings as to Jane's motive until near the end of the third hearing, after he had already declared these statements admissible under M.R.E. 803(4). Although Jones sets forth the two-part test for admissibility, it does not explicitly require that such findings be made on-the-record prior to admission. Here, the chancellor did make on-the-record findings, albeit after the evidence had been admitted pursuant to M.R.E. 803(4), and ostensibly in order to determine admissibility pursuant to M.R.E. 803(25).
As noted by the chancellor, a pre-school age child can hardly be said to have the sophistication to form a motive. Therefore, it seems Jane's "motive" in making the statements to Brenda Chance is consistent with the purposes of promoting treatment. Jane's statements to Chance identifying John as the perpetrator of her sexual abuse also appear to be reasonably pertinent to treatment, although John was not a member of Jane's household at the time these particular statements were made. Unlike the scenario in Jones, the identity of the perpetrator was pertinent to Jane's treatment as John's visitation was at issue. Consequently, the concerns of Renville, especially prevention of further abuse, were immediate in the instant case. See also Mitchell v. State, 539 So.2d at 1370 (where the child has been sexually assaulted by a family member, the need to remove the child from the situation becomes a pertinent part of treatment).
Pursuant to M.R.E. 803(4), Jane's motive was not inconsistent with the purposes of promoting treatment and her statements were of the type reasonably relied upon by a physician in treatment. Admission of Jane's hearsay statements via Brenda Chance's testimony, pursuant to M.R.E. 803(4), was not error.

b. M.R.E. 803(25)
The "substantial indicia of reliability" required by M.R.E. 803(25) are necessary to prevent confrontation clause problems. Griffith v. State, 584 So.2d 383, 388 (Miss. 1991).[9] This "reliability" is not to be judged in light of other corroborating evidence, else the confrontation clause may be violated. Griffith, 584 So.2d at 388 (citing Idaho v. Wright, 497 U.S. 805, 821-22, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 657 (1990)). The guidance provided by Wright, for determining trustworthiness or reliability of hearsay statements made by a child in sexual abuse cases, was set forth by this Court in Griffith: spontaneity and consistent repetition, mental state of declarant, use of terminology unexpected of a child of similar age, lack of motive to fabricate. However, as noted in Wright, these factors are not exclusive and do not provide the basis for a mechanical test. Wright, 497 U.S. at 822, 110 S.Ct. at 3150, 111 L.Ed.2d at 656.
The "spread eagle" statements, as well as Brenda Chance's hearsay testimony, were admitted pursuant to the newly added M.R.E. 803(25). The parties agreed that an in camera session between the chancellor and Jane would satisfy the requirement of M.R.E. 803(25) that the child testify. Consequently, Jane "testified as a witness" at the second hearing for purposes of M.R.E. 803(25)(b)(1). In an on-the-record statement overruling John's objection to the hearsay at issue, the chancellor referred to the comment to Rule 803(25), and noted that reliability of the hearsay statements is not to be conditioned on corroborating evidence. The chancellor, *1207 therefore, did not depend upon the medical testimony of the doctors in his determination of reliability.
The chancellor did not err in determining that certain hearsay statements made by Jane Doe, which implicated John Doe as the perpetrator of her sexual abuse, were admissible. The substantial indicia of reliability required by M.R.E. 803(25) to prevent confrontation clause problems were found by the chancellor, on-the-record, using the twelve (12) factors enumerated within the Rule. These findings are supported by substantial credible evidence. As the chancellor employed the correct legal standard and found adequate indicia of reliability from Jane's statements and the circumstances surrounding their making, he did not abuse his discretion in allowing the hearsay statements of Jane pursuant to M.R.E. 803(25).

B. Whether the chancellor committed manifest error in determining, during the first hearing, that the minor child had been the victim of sexual abuse.

1. The Parties' Contentions
John claims the chancellor erred in finding that Jane had been the victim of sexual abuse because two of the three doctors who had examined Jane had detected no trauma whatsoever, and one noted only trauma, but not sexual abuse. The only other evidence supporting a finding of sexual abuse, according to John, were the "abstract hearsay statements attributed to the child" as testified to by Brenda Chance. This combination of evidence, John asserts, is insufficient to support the chancellor's finding of abuse. Mary simply claims there was substantial credible evidence presented at the first hearing to support the chancellor's finding that Jane had been sexually abused.

2. Relevant Law and Analysis
This Court will not disturb the findings of fact made by a chancellor when such findings are supported by credible evidence and not manifestly wrong. Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985)). The weight and worth of witness' testimony is solely for the chancellor to determine. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987).
Whether Jane suffered sexual abuse is a question of fact. With the conflicting testimony presented, expert and otherwise, the chancellor was required to make a judgment on the credibility of the witnesses in order to resolve this question. Here, the chancellor said he found the testimony of Dr. Clark and Brenda Chance clearly revealed sexual abuse of Jane. He obviously gave greater weight to Dr. Carney's report and the testimony of Mary, Dr. Clark, and Brenda Chance than he gave to Dr. Sherwood's report and the testimony of John, Paulette Hall, Mickey Jones, and Dr. Stanley, and determined that Jane had indeed been sexually abused.
The chancellor did not err in determining during the first hearing that Jane had been the victim of sexual abuse. Ample evidence in the record supports the chancellor's finding of sexual abuse. Although there was conflicting testimony, expert and otherwise, the chancellor properly acted as the final arbiter. This Court affirms on the finding of abuse. The serious question here is the identity of the abuser(s).

3. Identification Proof
Prior to the third hearing, each party filed a request for relief from judgment. The chancellor granted Mary's request and modified the former judgment, suspending all future visitation between John and Jane and further enjoining John from any further contact with his child. John's request for relief from judgment was denied and he appeals the order denying him visitation rights with his child. This Court holds that John's appeal is meritorious on the insufficiency of the proof of identification of the abuser.
The chancellor found the proof of identification to be insufficient at the first hearing. This Court upholds that finding. Between the first and third hearing, this Court holds that the proof was no more sufficient than at the initial determination. (See footnote four herein).
One medical doctor believed the child had been abused, one found signs of physical *1208 trauma, and one found no signs of abuse. One expert had formed the opinion, after months of therapy sessions with Jane, that the child had been abused by John; another expert, after six sessions with the child, formed the opinion that John had not abused the child; still another found that Jane had not been sexually abused. The battery of tests run on John to determine whether he exhibited any characteristics of a sexual abuser showed nothing of the sort. The hearsay statements of the child, as related by Brenda Chance, were the most damaging to John. While it does not appear that the chancellor erred in finding that the child had been sexually abused, the chancellor did not have substantial credible evidence that John was the abuser.
The chancellor erred in suspending all visitation rights of John Doe. However, there is evidence warranting restriction of visitation. This Court reverses the denial of all visitation, based upon the insufficiency of proof of identity of the abuser, and remands for a determination of appropriate supervised visitation by the chancellor.

C. Whether the chancellor committed manifest error in awarding attorney fees to Mary Doe in both of the two hearings.

1. The Parties' Contentions
John argues that the chancellor erred in awarding attorney fees to Mary because proof of all McKee[10] factors was not presented at either hearing. Mary claims the McKee factors were met, and, in any event, the chancellor was authorized to award her attorney fees pursuant to Miss. Code Ann. § 9-1-41 (1972).

2. Relevant Law and Analysis
The first appeal began with Mary's motion to modify the divorce decree concerning the custody and visitation of the minor child. The allowance of attorney fees in matrimonial cases arose to allow the spouse without funds, traditionally the wife, to secure counsel to protect her own interests. Arlyss Welch Spence, Counsel Fees in Matrimonial Actions, 88 Neb.L.Rev. 761, 761-781 (1959). This Court has said attorney fees will be awarded to the party who can not afford to pay them in cases seeking modification of divorce decrees, whether such modification is sought on behalf of one of the spouses or on behalf of the minor children. Lindsey v. Lindsey, 219 Miss. 540, 546, 69 So.2d 203, 205 (1954); see also Pearson v. Hatcher, 279 So.2d 654, 656 (Miss. 1973). The test for allowance of attorney fees in divorce cases has evolved to the now familiar standards set forth below, which include two factors that have remained intact over the years  inability to pay and discretion of the chancellor.
An award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards. Adams v. Adams, 591 So.2d 431, 435 (Miss. 1991) (citing Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988)). See also Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993). Attorney fees are not generally awarded unless the party requesting such fees has established the inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss. 1992); Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991). The chancellor's discretion is limited in making an award of attorney fees. Smith v. Smith, 545 So.2d 725, 729 (Miss. 1989). "The fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged for was reasonably required and necessary." Dunn, 609 So.2d at 1286. When considering an award of attorney fees,
a sum sufficient to secure a competent attorney is the criterion by which we are directed. The fee depends on ... relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
*1209 Smith, 545 So.2d at 729 (quoting McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982)).
It was established at trial that Mary was unable to pay her attorney fees. The chancellor specifically found her attorney fees reasonable. No evidence was presented regarding preclusion of other employment because of acceptance of this case, but evidence satisfying the remaining McKee factors was presented. A portion of her legal fees was awarded to Mary.
Mary is correct in citing Miss. Code Ann. § 9-1-41 (1972) (effective date March 13, 1990), which states:
In any action in which a court is authorized to award reasonable attorneys' fees, the court shall not require the party seeking such fees to put on proof as to the reasonableness of the amount sought, but shall make the award based on the information already before it and the court's own opinion based on experience and observation; provided however, a party may, in its discretion, place before the court other evidence as to the reasonableness of the amount of the award, and the court may consider such evidence in making the award.
Miss. Code Ann. § 9-1-41 (1972).
It is true that Miss. Code Ann. § 9-1-41 (1972) allows an award of attorney fees based "on the information already before it and the court's own opinion." However, such discretion still requires some guidelines. Guidelines help to insure that the chancellor's award is based on factual information and is not arbitrary. This Court accordingly holds that chancellors should grant attorney fees under Miss. Code Ann. § 9-1-41 (1972) after considering the factors for attorney fees as stated in McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982).
However, under the circumstances of this case, particularly considering the novel evidentiary questions posed, this Court holds such an award of attorney fees would be an abuse of discretion. This Court also denies the cross appeal for attorney fees.

IV. CONCLUSION

On direct appeal, the chancellor did not err in determining that certain hearsay statements, purportedly made by a three year old child declarant, which implicated John Doe as the perpetrator of the child's sexual abuse, were admissible. The chancellor did not abuse his discretion in determining, during the first hearing under the unique facts of this case, that the minor child had been the victim of sexual abuse. The chancellor did err in awarding attorney fees to Mary Doe in both of the two hearings. This Court holds that the chancellor did err in identification of John Doe as the abuser and in suspending his visitation rights with his minor daughter and remands for a determination of appropriate supervised visitation.
On cross-appeal, this Court denies the award of attorney fees.
DIRECT APPEAL: JUDGMENT IS AFFIRMED IN PART; REVERSED AND REMANDED IN PART. JUDGMENT IS REVERSED AND RENDERED AS TO ATTORNEY FEES. CROSS-APPEAL: ATTORNEY FEES DENIED.
HAWKINS, C.J., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., specially concurs with separate written opinion joined by McRAE, J.
DAN M. LEE, Presiding Justice, specially concurring:
I concur with the majority's holding to reverse the chancellor's decision to terminate John Doe's right of visitation with his daughter. However, we write further on the question of the admissibility of Jane's testimony under M.R.E. 803(25) insofar as it pertains to John's confrontation rights.
In child custody cases where it is alleged that one parent has sexually abused their child, this Court must necessarily be mindful of the fact that the lower court proceedings to modify or terminate a parent's right to raise their offspring touches upon two of the accused parent's fundamental rights. The first fundamental right that the trial court *1210 must consider is the parent's Confrontation Clause rights as provided by the Sixth Amendment of the United States Constitution. This Court In Interest of C.B., 574 So.2d 1369 (Miss. 1990), determined that the Sixth Amendment of the United States Constitution affords civil litigants in child custody cases the right to confront witnesses against them. In Interest of C.B., 574 So.2d 1369 (Miss. 1990), we stated:

This is not a criminal case, but we are of the opinion that the right of confrontation should be accorded to an accused parent in such cases as this. The fact that the accusation is a terrible and shameful one ought not to blind us to the plight of one who may stand wrongfully accused. (emphasis added).
Id. at 1374.
An accused's right to confront witnesses against him is a fundamental right and is made obligatory on the States by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965). (emphasis added). Mississippi has chosen to extend the protection of the Confrontation Clause to parents accused of sexually abusing their children. In Interest of C.B., 574 So.2d 1369 (Miss. 1990). Therefore, any attempt to abridge this fundamental right is required to pass muster under "strict scrutiny" analysis. Rias v. Henderson, 342 So.2d 737, 739 (Miss. 1977). The accused's right to confront witnesses is a fundamental right. Pointer, supra. An individual's fundamental right can be abridged if the State can show: (1) a compelling state interest in abridging the right; and (2) that the statute, law or rule is narrowly tailored and cannot be achieved in a less burdensome way. Rias v. Henderson, 342 So.2d 737, 739 (Miss. 1977).
The United States Supreme Court in Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 2802-03, 101 L.Ed.2d 857, 866 (1988), reiterated the importance that the Sixth Amendment places upon the defendant's fundamental right to cross-examine witnesses against him. The United States Supreme Court recognized the dilemma faced by the accused and the alleged victim and discussed the effect that cross-examination might have on an alleged child sex abuse victim. The Court in Coy opined:
The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.
Coy, 487 U.S. at 1020, 108 S.Ct. at 2802, 101 L.Ed.2d 857 at 866.
The second fundamental right that the trial court should be mindful of is the parent's fundamental right to raise their child. This Court has recognized that a parent's right to raise his or her child is of a fundamental nature and is entitled to great protection. Vance v. Lincoln County DPW, 582 So.2d 414, 417 (Miss. 1991) citing Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). See also Adams v. Powe, 469 So.2d 76 (Miss. 1985). However, these parental rights may be abridged when the welfare of the child is threatened. Vance, 582 So.2d at 414. Consequently, any attempt by the State to abridge the parent's fundamental right to raise their child is subject to strict scrutiny analysis. Rias v. Henderson, 342 So.2d 737, 739 (Miss. 1977).
The United States Supreme Court has held that the State's interest in "the protection of minor victims of sex crimes from further trauma and embarrassment" is a "compelling" one. Globe Newspaper Co. v. Superior Court of Norfolk County, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982); see also Osborne v. Ohio, 495 U.S. 103, 109, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98, 109 (1990). The tension in these custody cases where sexual abuse is alleged necessarily pits the accused's fundamental right to raise their children and their fundamental right to confront witnesses against them against the State's compelling need to protect the children of this State from sexual *1211 abuse and molestation. Accordingly, the trial court should be ever mindful of these competing rights when allowing hearsay testimony under M.R.E. 803(25).
As stated previously this Court has extended the protection of the Sixth Amendment Confrontation Clause to child custody cases in which it is alleged that one parent sexually abused their child. In Interest of C.B., supra. Therefore, it follows that the Confrontation Clause of the Sixth Amendment requires that before M.R.E. 803(4) and M.R.E. 803(25) can be used to abridge the accused's right to confrontation, the law requires that the trial judge perform a two part analysis. First, the trial judge must determine that the witness would be "traumatized" if forced to testify in the presence of the accused sexual abuser and is therefore "unavailable" to testify. Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Second, the trial judge must then determine that the hearsay testimony contains the "particularized guarantees of trustworthiness" required for admission under the Confrontation Clause. Idaho v. Wright, 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638, 655 (1990). Only after the trial judge has met these two requirements can M.R.E. 803(4) and M.R.E. 803(25) be used to abridge the accused's right to confrontation.
In the case sub judice, we cannot say that Jane was unavailable. The parties' stipulated that Jane could speak to the chancellor in camera. Jane was available to testify and she did testify, albeit in the presence of the chancellor during their in camera discussion. Therefore we cannot say that John's right of confrontation was denied. Accordingly, the issue of whether John's Confrontation Clause rights were properly preserved is not squarely before this Court.
Accordingly, I would concur with the majority's opinion.
McRAE, J., joins this opinion.
NOTES
[1] The names of the parties to this case, as well as the names of other individuals involved, have been changed to protect the anonymity of the parties' minor child.
[2] The TRO was later amended, allowing John to exercise visitation with the minor child in the presence of one of two specified adults.
[3] Dr. Clark had been Jane Doe's doctor since September, 1989.
[4] The list included the father and his friends, the grandfather and his friend, E----, another relative called the Boogie man, Uncle ----, six strange names which are apparently nicknames.
[5] Interestingly, Chance initially told Mary that her evaluation of Jane would require 6 to 8 visits.
[6] The first appeal, from the chancellor's October 18, 1990 order granting Mary's first motion to modify judgment, was then stayed, pending hearing of the motion to re-open judgment.
[7] Jane had demonstrated various sexual acts, using anatomically correct dolls, on more than one occasion with Brenda Chance. Each time, Jane identified the adult male doll as her daddy and the little girl doll as herself.
[8] Mary's testimony was only offered as a proffer.
[9] This Court has found that, although not a criminal case, a parent accused of sexual abuse of a child should be afforded the right to confront witnesses against him. In Interest of C.B., 574 So.2d 1369, 1374 (Miss. 1990).
[10] McKee v. McKee, 418 So.2d 764 (Miss. 1982).