942 So.2d 193 (2006)
Joseph Eugene OSBORNE, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00991-COA.
Court of Appeals of Mississippi.
February 21, 2006.
Rehearing Denied August 1, 2006.
*194 James A. Williams, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
EN BANC.
KING, C.J., for the Court.
¶ 1. On April 7, 2004, Joseph Eugene Osborne was convicted by a Lauderdale County Circuit Court jury for the murder of five-year-old Charles Hopkins. Osborne was sentenced to serve a term of life imprisonment in the Mississippi Department of Corrections. Aggrieved, Osborne raises the following issues on appeal which we quote verbatim:
1. Whether Defendant is denied a fair trial, right to confrontation and due process of law when a child is declared competent to testify but the record shows he has been coached and limits his testimony to what he wants to say and the corroborating circumstances are suspect.
2. Whether a defendant is denied a fair trial, fundamental fairness, confrontation of witnesses and due process of law where hearsay of a child is repeated by those adults who heard same, including an expert where there are contradictory accounts of the child's statements and there is substantial evidence of opportunity and motive by the adults for implantation of memory in the child.
3. Whether an expert's testimony that a five-year-old witness is telling the truth supported by the expert's point by point analysis of factors that purportedly show the child's credibility denies a defendant a fair *195 trial, due process of law and confrontation of witnesses by buttressing the child's testimony.
4. [Whether] the court denies defendant a fair trial, due process of law and fundamental fairness when it admits a photograph of life scenes of a young child with his surviving brother that has no relevancy to the issues.
5. Whether defendant is denied effective assistance of counsel when trial counsel failed to object to numerous leading questions propounded to all the State's witnesses, including, for example 37 to the mother who implanted the child witness' memory, fails to contradict witnesses through hearing and trial testimony, fails to examine death mask and confront witnesses on size of hand, fails to acknowledge contradictions on opportunity of memory implantation and on mother's spanking of child, fails to get explanatory instruction on expert testimony and fails to object to vouching by testimonial statement of the prosecutor.
6. Whether the court denies defendant a fair trial, due process of law, and fundamental fairness when it fails to grant a new trial where the evidence is insufficient and may have been the result of bias, prejudice and improper prejudicial evidence.
Finding no error, we affirm.

FACTS
¶ 2. Joseph Eugene Osborne moved in with his girlfriend, Cindy Hopkins (Hopkins), on or about October 23, 2002. Hopkins lived in Meridian, Mississippi with her two sons, Charles Hopkins (Charlie) and Sam Hopkins. When Osborne moved in with Hopkins, Sam was three-years-old and Charlie was five-years-old.
¶ 3. On November 6, 2002, Hopkins suffered from a stomach virus. Osborne gave her some prescription medicine and offered to watch Charlie and Sam. Hopkins fell asleep at two o'clock in the afternoon. At some point in the afternoon, Kimble Frazier, a friend of Osborne, came to Hopkins' house to visit Osborne. Osborne fed Charlie and Sam dinner and later put them to bed in the room the boys shared. Hopkins woke up at about 10:30 p.m. She went into the boys' room and saw that they were asleep. Hopkins then went to the living room and talked to Osborne and Frazier for a couple of hours. She stopped by the boys' room again at about 1:30 a.m. as she and Osborne were headed to their bedroom to go to sleep. Frazier spent the night, sleeping on a day bed in the living room. Frazier testified that he went to sleep about ten or fifteen minutes after Hopkins and Osborne went to bed.
¶ 4. The next morning Hopkins and Sam awoke about 8 a.m. and watched television. At about 10 a.m. the two ate breakfast. Charlie was still in his room and Hopkins testified she thought he was just sleeping late. After eating breakfast, she went to check on him. When she entered the boys' bedroom, she saw Charlie lying face down in bed with her prescription Zyrtec pills strewn about the floor. She jerked the covers off of Charlie and saw that he was blue. Screaming and crying, she took Charlie in her arms. Frazier then awoke Osborne who called 911.
¶ 5. Although there was some bruising on Charlie's body, Hopkins initially believed that Charlie had died from an overdose. The pathologist's report determined that Charlie's cause of death was suffocation. Due to the suspicious nature of Charlie's death, the Meridian Police Department began a homicide investigation. Hopkins, Osborne, Frazier, and Sam were interviewed. Darrell Theall, an investigator *196 assigned to Charlie's case, said that at the time of the interviews no one in particular was a suspect, or in other words, everyone was a suspect. During the investigation the Department of Human Services temporarily placed Sam with one of Hopkins' relatives.
¶ 6. One evening in December 2002, Hopkins, Ellen Riley (Hopkins' sister), and Sam were visiting at Hopkins mother's house. Hopkins and Riley attempted to prepare an unwilling Sam for bedtime. According to Hopkins and Riley, Sam spontaneously said, "Charlie wouldn't go to bed that night either." He proceeded to say that no matter what Osborne tried, Charlie would not go to bed; Osborne even had to chase Charlie to get him back into bed. According to Riley and Hopkins, Riley began asking open ended questions such as "What happened next?" At a pretrial hearing, Riley testified that Sam said that Osborne was mad because Charlie would not go to sleep, but eventually, Osborne made Sam go to sleep. However, Hopkins' testimony revealed a much more detailed account of Sam's revelation. She testified that Sam told them that Osborne spanked Charlie to get him to go to bed and that Osborne placed his hand over Charlie's mouth and "took his breath away."
¶ 7. The next day Hopkins contacted the Meridian Police Department to set up an interview with Sam. However, the forty-five minute interview was not successful. Sam was non-responsive to many of the questions, and did not reveal the details of the story that he told his mother, aunt, and grandmother just the night before. Hopkins and Sam were later referred by an investigator at the Attorney General's office to Dr. Catherine Dixon, the clinical director of the Children's Advocacy Center. During a seven minute taped interview, Sam revealed that he witnessed Osborne kill Charlie and gave a detailed account of the event.
¶ 8. On August 1, 2003, Osborne was indicted by a Lauderdale County grand jury for depraved heart murder. A pretrial hearing was held on December 1, 2003, at which the trial court judge determined that Sam was competent to testify, and that Hopkins, Riley, and Dr. Dixon would be allowed to testify to Sam's hearsay statements. Osborne's trial commenced on April 5, 2004. At the close of the State's case, the defense moved for a directed verdict which was denied. Osborne declined to testify or call witnesses. On April 7, 2004, after six hours of deliberations, the jury returned a verdict finding Osborne guilty of murder.

LAW AND ANALYSIS

I.
¶ 9. Osborne's first assignment of error is that the trial court erred in finding Sam competent to testify. The determination of a child witness' competency to testify is left to the sound discretion of the trial court judge. Barnes v. State, 906 So.2d 16, 20 (¶ 15) (Miss.Ct.App.2004) (citing Mohr v. State, 584 So.2d 426, 431 (Miss. 1991)). A child is competent to testify if the court determines that the child has "the ability to perceive and remember events, to understand and answer questions intelligently and to comprehend and accept the importance of truthfulness." Williams v. State, 859 So.2d 1046, 1049 (¶ 13) (Miss.Ct.App.2003) (quoting Mohr v. State, 584 So.2d 426, 431 (Miss.1991)). The trial judge is given great deference in making this determination. Id. at (¶ 14). In Williams we held:
In order to prevail in its effort to exclude the testimony of a child witness, the party opposing the testimony must show that at the time the court made its *197 initial decision that it was apparent that the witness did not meet the criteria for testifying, not that the subsequent testimony was flawed or that the initial determination was possibly erroneous.
Id.
¶ 10. Sam was one week shy of his fifth birthday at the time of the pretrial hearing where he testified as follows. He was three years old when his brother was murdered. He knew the difference between the truth and a lie and he promised to tell the truth. On the date Charlie died, his mom was in bed sick and Osborne was taking care of him and his brother. When asked if Osborne had a friend with him the evening Charlie was murdered, Sam replied, "Only he (Osborne) killed him." He went on to testify that Charlie would not go to sleep when Osborne told him to. Osborne then spanked Charlie. Charlie still would not go to sleep, so Osborne came back to the bedroom. Sam said he pretended to be asleep, but he was peeking out of one eye to see what was going on. When asked what Osborne did when he came back a second time, Sam replied, "Killed him." When asked how, Sam illustrated by placing his hands over his mouth. Sam said that Frazier was asleep when Osborne killed Charlie. When asked if Sam remembered to whom he first gave this account, he replied, "I forgot about that part." He was non-responsive to some questions, and to others he replied that he did not "want to talk about that part".
¶ 11. The judge made an on the record finding that Sam (1) possessed an above average ability for a four year old to remember events, (2) possessed the ability to understand questions and respond intelligibly, and (3) understood the importance of testifying truthfully. Consequently, the judge ruled that Sam was competent to testify at trial.
¶ 12. In addition to challenging Sam's competency to testify, Osborne also challenges Sam's veracity by suggesting that Sam was coached to give the desired testimony. Credibility of testimony is a matter of jury determination. Thorson v. State, 895 So.2d 85, 98 (¶ 17) (Miss.2004) (citing Sheffield v. State, 749 So.2d 123, 125 (¶ 9) (Miss.1999)). Clearly, the jury found Sam's testimony to be credible.
¶ 13. We find that the trial judge was well within his discretion in determining that Sam was competent to testify. Therefore, this assignment of error must fail.

II.
¶ 14. Osborne's second assignment of error is that Dr. Dixon, Hopkins, and Riley were allowed to give hearsay testimony regarding Sam's revelation of his eyewitness account of Charlie's death. Mississippi Rules of Evidence Rule 801 defines hearsay as an out of court statement offered into evidence to prove the truth of the matter for which it is asserted. Rules 803 and 804 list thirty exceptions in which hearsay testimony is admissible. The trial judge ruled at the pretrial hearing that Dr. Dixon's testimony was admissible under Rule 803(4) and that Hopkins' and Riley's testimony were admissible under Rule 803(24).
¶ 15. Rule 803(4) provides that statements made for purposes of medical diagnosis or treatment are not excluded by the hearsay rule "if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances substantially indicating their trustworthiness." M.R.E. 803(4). A two-part test must be met before Rule 803(4) testimony may be admitted. First, "the declarant's motive in making the statement must be consistent with the purposes of *198 promoting treatment", and second, "the content of the statement must be such as is reasonably relied on by a physician in treatment." Davis v. State, 878 So.2d 1020, 1024 (¶ 12) (Miss.Ct.App.2004) (citing Doe v. Doe, 644 So.2d 1199, 1205-06 (Miss. 1994)). Osborne implies that this test was not met because the purpose of Dr. Dixon's interview was not to seek treatment for Sam, but rather a technique employed for the sole purpose of later allowing Dr. Dixon to testify as to Sam's veracity. The trial judge, however, made an-on-the record finding that the purpose of Dr. Dixon's session with Sam was relevant to her treatment and recommendation that Sam seek counseling and therapy for the trauma he suffered as a result of witnessing his brother's death.
¶ 16. Osborne also argues that the trial judge erred in allowing Hopkins and Riley to testify about Sam's revelation that he witnessed Charlie's death. The judge admitted this testimony under Mississippi Rules of Evidence Rule 803(24) "other exceptions," which states,
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
¶ 17. Hopkins and Riley testified that the then four-year-old Sam spontaneously revealed that he witnessed Charlie's death. The judge found that Sam's statements were freely given without any prompting from anyone present. As for the probative value of the statements, the judge found that Sam's giving the same account to his family members, to Dr. Dixon, and to the court at the pretrial hearing showed the consistency and credibility of Sam's story. The judge also found that the remaining requirements of Rule 803(24) had been met.
¶ 18. Our supreme court has stated that the judge must also make a determination that the hearsay statement in question does not qualify under any of the other enumerated exceptions before resorting to the catch-all exception found in Rule 803(24). Mitchell v. State, 539 So.2d 1366, 1371 (Miss.1989). The trial judge stated on the record that the hearsay statements to which Hopkins and Riley testified were admissible only under 803(24).
¶ 19. Our supreme court has also stated that the catch-all exception should be rarely used "so as not to devour the hearsay rule." In Interest of C.B., 574 So.2d 1369, 1373 (Miss.1990) (citing Mitchell v. State, 539 So.2d at 1370 (Miss.1989)). In Leatherwood v. State, the supreme court stated:
Rule 803(24) as promulgated by the Supreme Court represented a compromise. It recognized that not every contingency can be treated by detailed rules, that the hearsay rule has never been a closed system and should not be (for it would be pre-sumptuous to assume that all possibilities and new developments have been foreseen), and that, in a particular case, hearsay evidence which does not fall within one of the exceptions may *199 have greater probative value than evidence which does.
548 So.2d 389, 401 (Miss.1989) (citing J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 803(24)(01), at XXX-XXX-XXX (1984)).
¶ 20. We find that the case at hand is such a rare instance in which Rule 803(24) was properly invoked. In making his ruling on the admissibility of Hopkins' and Riley's proposed testimony, the judge quoted Rule 102 of the Mississippi Rules of Evidence. Rule 102 states, "These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." M.R.E. 102. After making a finding concerning the requirements of 803(24), the judge went on to note that the testimony of Dr. Dixon, Hopkins, and Riley showed the consistency of Sam's account. We find the trial judge properly admitted Dr. Dixon's testimony under Rule 803(4) and Hopkins' testimony under Rule 803(24).

III.
¶ 21. Osborne's next assignment of error is that Dr. Dixon improperly commented on Sam's veracity during her testimony. Osborne claims that the entirety of Dr. Dixon's testimony was her opinion that Sam was telling the truth and his eyewitness account should be believed.
¶ 22. Dr. Dixon testified that the purpose of her interview with Sam was to collect information about any crime of which he may have been a victim or witness and to assess him for trauma to determine what his treatment needs might be if symptoms of trauma were present. Dr. Dixon then testified about the taped interview she conducted with Sam. Additionally, the interview tape was admitted into evidence and played for the jury. The remainder of Dr. Dixon's testimony mostly pertained to "markers" she uses in forensic interviews to determine whether a child's account is credible, and how Sam's behavior compared.
¶ 23. In Griffith v. State the Mississippi Supreme Court recognized that a majority of courts have held that direct witness testimony that a child victim has told the truth is inadmissible. 584 So.2d 383, 386-87 (Miss.1991). The Griffith court went on to state, "We have indicated that such testimony is, at best, `of dubious competency.'" Id. (quoting Williams v. State, 539 So.2d 1049, 1051 (Miss.1989)).
¶ 24. This Court recently decided the case of Elkins v. State, in which an expert in the area of forensic interviewing testified that a child sex abuse victim's "behavior and demeanor were consistent with those of children who had been sexually abused, that children who have been coached to lie generally are unable to keep their stories straight, and that [the child victim] related the same facts consistently throughout the interview." Elkins v. State, 918 So.2d 828 (¶ 9) (Miss.Ct.App. 2005). On appeal Elkins argued that the forensic interviewer's testimony was improperly admitted into evidence because it amounted to "an expert opinion that [the child victim] was telling the truth about the abuse." Id. at (¶ 7). This Court held, "While an expert may not opine that an alleged child sex abuse victim has been truthful, the scope of permissible expert testimony under Rule 702 includes an expert's opinion that the alleged victim's characteristics are consistent with those of children who have been sexually abused." Id. at (¶ 9) (citing U.S. v. Whitted, 11 F.3d 782, 785-86 (8th Cir.1993)).
¶ 25. A large portion of Dr. Dixon's testimony concerned the indicators she *200 looks for in assessing credibility during a forensic interview with a child who has witnessed and/or been the victim of a crime. Dr. Dixon's testimony also included her observation of Sam's mannerisms during their interview. However, Dr. Dixon never directly testified as to whether she believed Sam told the truth during the interview. Two excerpts from Dr. Dixon's testimony that most closely approach commenting on Sam's veracity follow.
Q. You mentioned being demonstrative, that [Sam] was showing you things [during the interview]. Is that important to a psychologist?
A. One of the things we look for in a child's account in assessing its credibility is whether or not the child had an emotional or affective component to the telling of the story. . . . And so I was watching Sam to determine whether he had sort of an emotional component to this. He had what I see in children a lot of times, which I call it `the movie behind the eye.' It is like the child sort of looks out and you can see them reliving the event, and as they are talking about it their body gets involved in the retelling. And that is how Sam was. He was almost in the moment as he was telling me about this and he was trying to convey this information and he was using his body and making gestures like this (indicating) that you just don't see in a child who has been coached to tell a story. It was a real interesting and I think important element to his credibility.
. . . .
Q. And how does Sam do in answering questions that fit what you had already been told about what happened?
A. Well, his account was consistent, you know, with what was corroborated by his mother, both about where he was, who was there, you know, that there was even a tree outside the door that the boys typically played on. So, you know, his account was entirely within the realm of reason and consistent with what I already knew about things that his mother had told me.
¶ 26. We find that Dr. Dixon did not impermissibly testify that Sam was telling the truth during their interview in which he described his brother's death at the hands of Osborne. Rather, Dr. Dixon testified about the indicators that she looks for during a forensic interview with a child victim/witness and then described Sam's demeanor and mannerisms during their interview. Accordingly, this assignment of error is without merit.

IV.
¶ 27. Osborne also argues that the trial court erred in admitting into evidence life scene photographs[1] of Charlie. Osborne contends that these photographs were irrelevant and used only as a tool to inflame the jury. However, trial counsel only objected to the relevancy of the photographs, not to their potential prejudicial effect. One may not raise an issue on appeal which was not raised in the trial court. Lewis v. State, 905 So.2d 729, 734 (¶ 14) (Miss.Ct.App.2004) (citing Haggerty v. Foster, 838 So.2d 948, 954 (¶ 8) (Miss. 2002)). We therefore limit our review of this issue to the relevancy of the photographs.
¶ 28. This Court employs the abuse of discretion standard of review regarding the admission or exclusion of evidence. Lewis, 905 So.2d at 732 (¶ 7) (citing *201 Whitten v. Cox, 799 So.2d 1, 13 (¶ 27) (Miss.2000)). Reversal based on an error involving the admission or exclusion of evidence is proper only when the error "adversely affects a substantial right of a party." Id.
¶ 29. "The fact that a photograph of the deceased in a homicide case might arouse the emotions of jurors does not by itself render it inadmissible so long as introduction of the photograph serves some legitimate, evidentiary purpose. It is within the sound discretion of the trial judge to determine whether or not the photograph has a legitimate, evidentiary purpose." Davis v. State, 904 So.2d 1212, 1216 (¶ 14) (Miss.Ct.App.2004) (citing Walker v. State, 671 So.2d 581, 601 (Miss. 1995)).
¶ 30. The judge overruled defense counsel's objection to admitting the photographs of Charlie into evidence, finding that the photos had "some probative value showing size, weight, age, physical characteristics." We find that the judge was well within his discretion to admit the photographs.[2] This issue is without merit.

V.
¶ 31. Osborne's next assignment of error is that he was rendered ineffective assistance of counsel due to his counsel's failure to (1) object to numerous leading questions, (2) contradict witnesses at the pre-trial hearing and trial, (3) examine the "death mask" and question witnesses about the size of their hands, (4) request explanatory instruction on expert testimony, and (5) object to vouching by the prosecutor.
¶ 32. To succeed on an ineffective assistance of counsel claim, the appellant must prove that trial counsel's performance was so deficient that the appellant was denied his Sixth Amendment right to counsel and that the deficient performance in fact prejudiced the outcome of the case. Willcutt v. State, 910 So.2d 1189, 1193 (¶ 10) (Miss. Ct.App.2005) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The second prong requires a showing that the deficiencies were so egregious as to deny the appellant a fair, reliable trial. Id. The Strickland test is extremely difficult to meet since judicial review of trial counsel's performance is highly deferential. Our supreme court has stated,
A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'
Knox v. State, 901 So.2d 1257, 1261-62 (¶ 11) (Miss.2005) (citing Stringer v. State, 454 So.2d 468, 477 (Miss.1984)).
¶ 33. Osborne lists approximately forty instances of leading questions asked by the State of Hopkins which amounts to ten pages of the Appellant's brief. However, Osborne fails to state how these leading questions in any way prejudiced him. "Leading questions . . . will rarely create so distorted an evidentiary presentation as to deny the defendant a *202 fair trial." Walker v. State, 880 So.2d 1074, 1077 (¶ 8) (Miss.Ct.App.2004). After reviewing each instance of leading questions asked of Hopkins, we find that the elicited answers could have in no way prejudiced Osborne. As for the leading questions asked of Sam, it is well established that "[c]hildren are a classic example of the kinds of witnesses for whom leading questions may be necessary." Barrett v. State, 886 So.2d 22, 25 (¶ 16) (Miss.Ct.App. 2004) (citing Ivy v. State, 522 So.2d 740, 742 (Miss.1988)).
¶ 34. As for trial counsel's failure to contradict witnesses, we find that this was trial strategy. As for trial counsel's failure to examine the "death mask,"[3] even were we to find this was deficient performance, there was no resulting prejudice. Although defense counsel did not examine the mask, he did have access to photographs which depicted the bruises on Charlie's face. Similarly, we cannot say that Osborne was prejudiced by counsel's failure to question witnesses about the size of their hands; although the pathologist testified on direct that the large hand mark on Charlie's face appeared to be that of a male hand, on cross he opined that it could possibly be a female handprint. Osborne also argues that trial counsel was deficient in not obtaining a jury instruction that expert witness' opinions are merely advisory and not to be blindly followed. The jury was instructed that they were to determine the weight and credibility to be given to each witness's testimony, and thus we find this issue is without merit.
¶ 35. We find that Osborne's trial counsel did not render ineffective assistance.

VI.
¶ 36. In his final assignment of error, Osborne states that the evidence was legally insufficient. Oddly, Osborne makes this bare assertion, cites to one case concerning legal sufficiency, and then ends his brief without discussing the evidence or illustrating how the evidence was insufficient.
¶ 37. "The appellant has a duty to show by plausible argument with supporting authorities how the lower court erred." Riley v. State, 855 So.2d 1004, 1007 (¶ 5) (Miss.Ct.App.2003) (citing Stidham v. State, 750 So.2d 1238, 1243 (¶ 22) (Miss.1999)). Assignments of error unaddressed in the briefs are deemed abandoned and waived. Id. (citing Magee v. State, 542 So.2d 228, 234 (Miss.1989)). However, we briefly note that the State presented an eyewitness to the murder, along with two witnesses whose testimony revealed the consistency of the child witness's account, and the arguably incriminating testimony of Osborne's cellmate.[4] We find that the evidence was legally sufficient for a reasonable jury to find Osborne guilty of murder. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005).
¶ 38. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE TO A LIFE TERM IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF *203 CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
ROBERTS, J., NOT PARTICIPATING.
NOTES
[1] Exhibit seven was a picture frame which contained four photographs. Two photographs were of Charlie and the other two photographs were of Charlie and Sam.
[2] Osborne cites only to cases dealing with gruesome crime scene photographs and urges this Court to analyze this issue as such. Osborne's reliance on these cases is misplaced.
[3] A death mask is created by placing a plaster-like substance over the deceased's face. The death mask was created so that the pathologist could replicate the bruises on Charlie's face.
[4] Osborne's cell mate testified that Osborne seemed nervous when he first discovered that Charlie's body was to be exhumed. He also testified that Osborne asked him if he thought the authorities would be able to determine that Osborne had placed his hand over Charlie's mouth a couple of nights before the murder.