KING, C.J., for the Court.
¶ 1. At the conclusion of four years of examinations and hearings, the Chancery Court of Madison County ordered R.L.N.[1] to cease all visitation with his son based on the court’s finding that R.L.N. had sexually molested him. Aggrieved, R.L.N. raises the following issues on appeal which we quote verbatim:
I. Did the chancellor err in placing the burden on the father, accused of sexually abusing his four year old son, to prove his innocence before ending four years of strict supervised visitation, where a D.H.S. investigation and two independent psychologists did not confirm abuse?
II. Did the chancellor commit manifest error in determining that a four year old child had been the victim of sexual abuse committed' by his father, when the child made inconsistent statements about whether he was abused during the first two years of the investigation, but after four years of almost continual examination the child began to “remember” additional episodes of abuse by his father from years earlier?
III.Did the chancellor commit manifest error in suspending all visitation of the father with his minor son, where the expert testimony was that the child will be harmed by the suspension of visitation and that in all probability the child will not be harmed by expanding visitation with the father?
PROCEDURAL HISTORY
¶ 2. C.P.N. and R.L.N. were divorced in March of 2000. The chancellor ordered joint legal custody of their then four-year-old son, B.N., with the mother (C.P.N.) having primary physical custody. After B.N. began exhibiting disturbing behavior and making allegation of sexual abuse at the hands of his father (R.L.N.), C.P.N. filed a motion to restrict R.L.N.’s visitation with B.N. A hearing on this motion was held on June 12, 2001. On July 25, 2001, the chancellor ordered restricted visitation. The order provided that R.L.N. was to have professionally supervised visitation with B.N. no less than twice a week and would be allowed daily telephone conversations with B.N. The order further provided that B.N. was to be evaluated by Dr. Nancy Horton, a court appointed psychologist, in an attempt to determine the source of the allegations. On November 28, 2001, Hermine Welch, the guardian ad litem, filed a Motion for Order in Conformity With Expert Opinion. The motion referenced the recommendation of Dr. Horton that restricted visitation continue and that B.N. be placed in counseling. On November 30, 2001, the chancellor granted the motion. On March 11, 2002, R.L.N. filed a pro se motion to restore unsupervised custody. The chancellor denied R.L.N.’s motion.
¶ 3. Again on January 2, 2003, R.L.N., this time through counsel, filed a Motion *623 for Unsupervised and Extended Visitation. A hearing on this motion was held on January 15, 2004, in which the testimony was substantially similar to that presented in the June 12, 2001 hearing. The hearing continued on January 23, 2004. On March 23, 2004, the chancellor rendered a final judgment terminating visitation between R.L.N. and his son.
STATEMENT OF FACTS
¶ 4. B.N.’s parents had been divorced for about six months when B.N. began exhibiting very disturbing behavior at daycare. His teachers observed that B.N. displayed extremely aggressive behavior, usually with little or no provocation. In addition to violent behavior, B.N. also frequently exhibited advanced sexual knowledge. B.N. was expelled from one daycare for such misconduct, including exploring little girls’ bodies in a way that teachers described as unusual for a child of his age. After these reports, C.P.N. began taking B.N. to see Dr. Angela Herzog, a psychologist appointed by the court during the couple’s divorce.
¶ 5. While enrolled in a second daycare, B.N.’s teacher saw him on the playground kneeling next to a little girl who was lying on her stomach with her panties down while B.N. fondled her buttocks with his finger. When asked by the teacher about the incident, B.N. responded that his father put pencils in his “hiney.” The teacher testified that she had several conversations with B.N. about his father, and B.N. mentioned the pencil incident three or four times. She also asked B.N. if he could describe how his dad hurt him, to which he got on all fours and stuck his bottom up. Other teachers also testified about B.N.’s behavioral problems.
¶ 6. In November of 2000, Dr. Herzog contacted the Department of Human Services (D.H.S.) to investigate possible sexual abuse. D.H.S. reported that they were unable to find any signs of sexual abuse. Dr. Herzog also told C.P.N. that she wanted her to take B.N. to Dr. Meeks for a physical examination. While D.H.S. found no signs of abuse, Dr. Meeks’ report suggested that although there was no tearing, it appeared that B.N. may have become desensitized in the area of his anus. However, Herzog ultimately concluded that she was uncertain as to whether B.N. had been sexually abused.
¶ 7. C.P.N. testified that based on B.N.’s behavior, she believed that R.L.N. had molested B.N. She also testified that she did not believe that R.L.N. had molested B.N. since November or December of 2000.
¶ 8. At the June 2001 hearing, Hermine Welch, the guardian ad litem, declined to give a recommendation to the court regarding visitation. She stated her belief that something terrible had happened to B.N. but that she was not convinced that his father was the perpetrator. She did recommend placing B.N. in counseling. Welch also testified at the January 2004 hearing. Her only recommendation was that B.N. submit to a psychiatric evaluation.
¶ 9. At the 2004 hearing, B.N.’s new teachers testified and expressed similar concerns to those of B.N.’s previous teachers. At the January 2004 hearing, R.L.N.’s relatives testified favorably for R.L.N., while C.P.N.⅛ sister testified that she believed R.L.N. had molested B.N. Most disturbing was the sister’s testimony in which she recounted something B.N. cried out in his sleep one night while he was staying with her; “Please stop. It’s uncomfortable. I don’t like it.... Please, take it out. It hurts. It hurts.”
¶ 10. Paul Davey, a child therapist who began counseling B.N. in 2002, testified that he believed that B.N. had been sexu *624 ally abused by his father. However, Da-vey also testified that B.N. had repeatedly told Davey that he still wanted to see his father so long as Davey or someone like him was present.
¶ 11. In his final judgment the chancellor ordered (1) that all visitation between B.N. and his father stop immediately, (2) that B.N. see a specialist who could treat him, (3) that B.N. be placed in an after school program for troubled children, and (4) that B.N.’s guardian ad litem report back to the court within six months regarding B.N.’s progress. The guardian ad litem’s report should have been submitted to the court by the end of September 2004. However, no such report or any evidence of B.N.’s progress since the final judgment appears in the record.
ANALYSIS
¶ 12. This Court will not disturb a chancellor’s findings of fact unless such findings are manifestly wrong or unsupported by substantial credible evidence. Fountain v. Fountain, 877 So.2d 474, 477 (¶ 9) (Miss.Ct.App.2003). The Mississippi Supreme Court defines substantial evidence as “such .relevant evidence as reasonable minds might accept as adequate to support a conclusion or to put it simply, more than a mere scintilla of evidence.” Tucker v. Prisock, 791 So.2d 190, 192 (¶11) (Miss.2001) (internal quotations omitted).
I.
¶ 13. R.L.N. complains that the chancellor erroneously placed the burden on him to prove that he did not molest his son. This Court finds that the record does not support that contention. Instead, the record reveals that the chancellor wanted to hear from everyone with personal knowledge that was involved in B.N.’s life. The chancellor was faced with differing opinions from expert and lay witnesses as to whether B.N. had been sexually molested by his father. R.L.N. seems to suggest that the inquiry should have ended with the inconclusive DHS report and the findings of Dr. Herzog. However, the chancellor is charged with the responsibility of protecting children and determining both custody and visitation based on the child’s best interest. Newsom v. Newsom, 557 So.2d 511, 517 (Miss.1990). We find that it was in B.N.’s best interest for the chancellor to hear from everyone involved, and this did not amount to placing the burden on R.L.N. to prove his innocence.
¶ 14. The evidence in this case was highly contentious. DHS reported that they were unable to find any signs of sexual abuse. However, Dr. Meeks’ report suggested that although there was no tearing, it appeared that B.N. may have become desensitized in the area of his anus.
¶ 15. In addition several of B.N.’s teachers testifying about B.N.’s violent and sexual behavior, the director of the daycare testified that she had concerns that B.N. had been physically or sexually abused. The chancellor, in his opinion, noted the director’s credibility, citing the director’s extensive history of working with abused children.
¶ 16. Dr. Herzog testified that she questioned the veracity of B.N.’s accusations. Regarding the “pencil in the hiney” allegation, Dr. Herzog said that at one point B.N. told her that his mom told him to say that. Another time, B.N. told Dr. Herzog that his uncle told him to say that. In addition to inconsistencies, Dr. Herzog said she doubted the allegations because there was no medical corroboration and B.N. could not give any contextual clues about the incident — the how, when, where or why. Dr. Herzog also testified that B.N. appeared to be much more comfortable and relaxed around his father than *625 around his mother. Dr. Herzog’s ultimate conclusion was that she could not be certain that B.N. had even been sexually-abused, much less by his father. Rather, she attributed B.N.’s behavior to the “messy divorce.” Dr. Herzog also testified that she believed that B.N. may not always be able to distinguish reality from fantasy. She further testified that B.N. may be genetically predisposed to psychological difficulties.
¶ 17. While Dr. Herzog testified that she could not conclude that B.N. had been sexually abused, the chancellor clearly called her credibility into question. Specifically, the chancellor noted that Dr. Her-zog was unable to answer direct questions with precision and accuracy, and it appeared to the chancellor that Dr. Herzog “shot from the hip” when the court pressed her for a recommendation.
¶ 18. Davey testified that he believed that B.N. had been sexually abused, and he believed that B.N.’s father was his abuser. His main concern was that B.N. had repeatedly named his father, and no one else, as his abuser and would not recant the allegation.
¶ 19. On cross-examination Davey testified that during their first meeting B.N. told him that he had made up the stories about his father. Also, B.N. made new allegations to Davey that had not been reported to teachers or other counselors, such as his father forced him to drink urine when he was three years old. B.N. also made up stories about having brothers and sisters. Additionally, B.N. told Davey that during a supervised visitation that took place at a local church his father whispered in his ear that he wanted to play with B.N.’s penis. B.N. also said that he reported this to an intern charged with supervising the visits. However, when the intern was questioned about this, he testified that it never happened. While Dr. Herzog evaluated these inconsistencies in a way that challenged B.N.’s veracity, Da-vey opined that the inconsistencies were due to B.N.’s age and lack of vocabulary at the time he was evaluated by other practitioners.- Davey was also asked about Dr. Horton’s use of anatomically correct dolls when she examined B.N., and Davey confirmed that nearly half of all children made false accusations of sexual abuse when exposed to these dolls. Davey was also asked if it was possible that B.N.’s memories of abuse could be the result of years of questioning about his father and about his sexual behavior along with B.N.’s observations of the extremely restricted visitation. Davey said that it was possible but in his opinion unlikely that these were false memories.
¶ 20. In his opinion, the chancellor cited the testimony of B.N.’s teachers, Dr. Her-zog, Paul Davey, R.L.N., and C.P.N. The chancellor also noted that since the hearing Davey’s license had been revoked by the Mississippi State Board of Examiners for Licensed Professional Counselors for falsifying and misrepresenting test results. We cannot say that we are unconcerned with this revelation about Davey. However, the chancellor is exclusively charged with determining the weight and worth of a witness’ testimony. Doe v. Doe, 644 So.2d 1199, 1207 (Miss.1994).
¶ 21. While R.L.N. construes the chancellor’s actions as placing the burden on him to prove his innocence, this Court finds that the chancellor exercised an abundance of caution in keeping B.N.’s best interest in the forefront of his decision. Accordingly, we find that this issue is without merit.
II.
¶22. R.L.N. next argues that the chancellor erred in finding that B.N. had been sexually abused by his father. *626 Whether a child has been sexually abused is a question of fact, and when such testimony is in conflict, the chancellor must resolve the question by making a determination of the credibility of the witnesses. Doe, 644 So.2d at 1207. The case at hand is strikingly similar to Doe in that there seems to be little question about whether B.N. was sexually abused. The murkier question seems to be whether there was enough proof to establish that B.N.’s father was in fact the abuser.
¶ 23. In the present case, the chancellor specifically stated in his findings of fact the testimony upon which he based his decision. Additionally, the chancellor noted the credibility he afforded each witness. Certainly, the chancellor’s finding that B.N. had been sexually abused by R.L.N. was based on more than a “mere scintilla” of evidence. We must note that while R.L.N. points to inconsistencies in B.N.’s allegations, B.N. has never named another person as his abuser. During four years of hearings and examinations, no one else has been implicated as sexually abusing B.N. Therefore, we cannot find that the chancellor’s finding was based on insufficient credible evidence or that the chancellor was manifestly wrong.[2]
III.
 ¶ 24. R.L.N.’s final argument is that the chancellor erred in suspending all visitation between R.L.N. and B.N. “The chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law.” Newsom, 557 So.2d at 517. Restrictions placed on visitation are within the sound discretion of the chancellor. White v. Thompson, 569 So.2d 1181, 1185 (Miss.1990).
¶ 25. R.L.N. states that the expert testimony was that B.N. will be harmed by the suspension of visitation and that in all probability the child will not be harmed by expanding visitation with the father. However, we disagree with this interpretation. Davey clearly testified that B.N. will likely be adversely effected if all ties between he and his father are severed, but that B.N. has already been and will continue to be adversely effected if he continues to see his father. Davey also testified that if B.N. were telling him that he did not want to see his father, Davey would not hesitate recommending to the court that visitation cease. However, B.N. tells Da-vey that he wants to get to know his father and wants to see him on a supervised basis. When asked by B.N.’s guardian ad litem if Davey had a suggestion for the court on the ultimate issue of R.L.N.’ visitation, Davey stated that there was no good clean answer. However, Davey’s ultimate recommendation to the court was to suspend visitation for a period of time, and that after sixty or ninety days, B.N. should be examined to determine the impact.
¶ 26. This Court finds that the chancellor did not err in ordering visitation to stop immediately. He clearly had B.N.’s best interest in mind, and based his decision on more than a “mere scintilla” of evidence.
*627 ¶ 27. In our reading of the chancellor’s order, we do not believe that the possibility of R.L.N. regaining supervised visitation with B.N. has been foreclosed. While part one of the chancellor’s order states that visitation between R.L.N. and B.N. shall stop immediately, part five of the order concludes by stating that the guardian ad litem shall report back to the court in six months regarding B.N.’s progress.
¶ 28. In Harrington v. Harrington, our supreme court stated:
The chancellor has broad discretion when determining appropriate visitation and the limitations thereon. When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child.
648 So.2d 543, 545 (Miss.1994).
¶ 29. The chancellor’s order along with the conclusion of his accompanying opinion indicates that the chancellor intends to retain jurisdiction over this matter. The guardian ad litem’s report detailing B.N.’s progress should have been submitted to the chancellor by September 23, 2004. However no such report appears in the record. If this report reveals that B.N.’s mental and emotional state has improved due to the termination of visitation with his father, the chancellor should permanently terminate visitation between R.L.N. and his son. However, if it is found that the termination of visitation has detrimentally effected B.N., and R.L.N. can show that it is in B.N.’s best interest to resume visitation, the chancellor should revisit this matter, keeping in mind the importance of fostering as healthy a relationship as possible between R.L.N. and B.N.
¶ 30. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., BRIDGES, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ„ CONCUR. IRVING, J., CONCURS IN RESULT ONLY.

. Due to the sensitive nature of this case, we refer to the parties by their initials only.

. We also note that in the Appellant's brief counsel for R.L.N. erroneously refers to this case as one seeking to terminate the rights of the father. R.L.N. then cites to P.K.C.G. v. M.K.G, 793 So.2d 669 (Miss.Ct.App.2001) and insists that C.P.N. was bound to prove her case by clear and convincing evidence. However, custody and visitation considerations differ from termination of parental rights, as parental rights encompass more than just custody and visitation. In re T.A.P., 742 So.2d 1095, 1104 (¶ 41) (Miss.1999). This case was clearly one involving visitation. No one involved filed a petition to terminate parental rights.