# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00675-COA

**JORDAN BARLOW WALKER**                                                          **APPELLANT**

**v.**

**BRADLEY RHETT HASTY**                                                              **APPELLEE**

DATE OF JUDGMENT:                05/24/2023
TRIAL JUDGE:                     HON. TAMETRICE EDRICKA HODGES
COURT FROM WHICH APPEALED:       HINDS COUNTY CHANCERY COURT,
                                 FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:          DAVID BRIDGES
ATTORNEY FOR APPELLEE:           JOHN G. HOLADAY
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                     AFFIRMED - 10/01/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Bradley Rhett Hasty and Jordan Barlow (Hasty) Walker were granted an irreconcilable differences divorce in 2019 by the Hinds County Chancery Court. The divorce decree incorporated the parties' detailed custody and property settlement agreement, which included provisions concerning visitation of their child, LCH.[1] Thereafter, each party filed actions for contempt and modification. On May 24, 2023, the chancery court entered a judgment modifying Brad's visitation and increasing his child support obligation. Jordan appeals. Having reviewed the record, the arguments of the parties, and relevant caselaw, we affirm the chancery court's judgment.

---

[1] For privacy reasons, only the child's initials are used.

**Facts**

¶2.     Brad and Jordan, who lived in Clinton, Mississippi, were divorced in the Hinds County Chancery Court on June 12, 2019, in an irreconcilable differences divorce proceeding.  Incorporated into the divorce decree was their detailed, twenty-two-page custody and property settlement agreement, which included provisions for the custody and visitation with their only child, LCH, who was three years old at the time.  The parties shared joint legal custody, and Jordan was given physical custody of the child.

¶3.     The settlement agreement itemized with great specificity Brad's regular visitation, including the first, third, and fifth weekends of each month from 5 p.m. on Fridays until 7 a.m. on Mondays, and visitation with the child every week from 6 p.m. on Tuesdays to 7 a.m. on Thursdays.  The agreement also included visitation on holidays, Mother's and Father's Day, the child's birthday, spring break, summer, weddings, funerals, and other family events. Brad forfeited visitation if he was more than thirty minutes late when picking up the child without prior notice.  The agreement also contained a "right of first refusal" provision, which stated that if a party could not care for the child, the other was given the first right to take the child before a third-party babysitter/caretaker was engaged.  The agreement provided for liberal FaceTime communication between the child and the parents.  Brad was ordered to pay $400 per month in child support, provide medical insurance, and pay half of the child's educational and extracurricular expenses.[2] The parties alternated years that they would claim the child as a dependent for tax purposes.

---

[2] Brad was making $40,000 per year at the time of the divorce.

¶4.    Both parties remarried after the divorce.  At first, Jordan and LCH lived in Madison and then moved, along with Jordan's new husband, to Flora.[3]  Brad, his new wife, and her daughter (his stepdaughter) moved to Brandon.  Because of the distance, Brad's midweek visitation with LCH became problematic, as it was difficult for him to get the child to school in Flora and be back at his job on time.  Thereafter, Brad found a new job working off- shore, with "two weeks on and two weeks off."

*Subsequent Contempt and Modification Motions*

¶5.    On November 18, 2019, Brad filed a motion for contempt, alleging that Jordan was sending him harassing and demeaning texts and had not accommodated his new work schedule when he tried to visit LCH.  He alleged Jordan would not let him have more time with the child during the two weeks he was at home.  He also raised an altercation the two had at the daycare center when Brad tried to pick up the child.  Brad sought a modification of the custody and visitation schedule.  On January 24, 2020, Jordan filed a counterclaim for contempt, alleging that Brad had not paid daycare fees, was drinking alcohol in violation of the court's order, and was wrongfully claiming LCH as a dependent on his tax return.  She also asked for an increase in child support.

¶6.    In March 2020, Brad's employment changed again, and he notified the court that he was working at Van Camp Trailer & Body from 7 a.m. to 4 p.m.  A hearing date  was set for September 28, 2020, but no hearing was held that day.

¶7.    In August 2020, when Jordan contended that the child returned from visitation with

---

[3] Immediately after the divorce, Jordan and the child moved to Madison to live with her parents and then moved to Flora.

Brad "in pain, bruised, and complaining that Brad had hurt her," she took the child to the doctor, who made a mandatory report of suspected abuse with the Clinton Police Department. The police department contacted the Department of Child Protection Services (CPS). On August 7, 2020, the court appointed Kate Eidt as a guardian ad litem (GAL) of the minor child, and on August 19, 2020, Jordan filed a motion for emergency injunctive relief. CPS had a no-contact order issued, and the motion for emergency relief was set for a hearing on September 8, 2020. Apparently, the child was later evaluated at University of Mississippi Medical Center, and the staff there did not find any abuse. After October 20, 2020, CPS lifted the no-contact order, and Brad resumed visitation with the child.

¶8. In November, 2020, Jordan took the child to the doctor again, which spurred a second CPS investigation and another interruption to Brad's visitation. However, in December 2020, the GAL informed Jordan that CPS had finished its investigation and closed the case, and Brad was able to visit thereafter.

¶9. On February 2, 2021, Brad filed a combined second motion for contempt and motion for modification. In it, he pleaded that Jordan had failed to pay a car note as ordered. Brad also listed twenty-two times between August and December 2020 that Jordan had refused him visitation with LCH. Brad also claimed that Jordan had filed several baseless complaints with CPS despite the GAL's and her own attorney's advice against doing so.

*March 9-10, 2022 Hearing*

¶10. On March 9-10, 2022, the chancery court held a hearing on the outstanding motions, including Brad's November 2019 motion for contempt and modification, Jordan's January

4

2020 answer and motion for contempt and modification, Jordan's August 2019 motion for emergency injunctive relief, and Brad's February 2021 motion for contempt and modification.

¶11.   At the beginning of the hearing, the court noted that no evidence substantiated the abuse allegation against Brad, and the court confirmed with Brad that he was not seeking custody.  Those testifying at the hearing included Brad and Jordan, as well as Denise Jeffers (Brad's mother) and the GAL, Kate Eidt.  Jeffers testified that Jordan had made harassing phone calls, sent harassing texts, and sent the police to their house if Brad did not immediately respond.  Jeffers also testified that Jordan refused to let the child attend Jeffers' wedding, which is provided for in the ordered visitation schedule.  Jordan would only let LCH attend if Brad agreed to give up his Easter visitation.

¶12.   In her testimony, Jordan admitted that she had sent some ugly texts to Brad and that she had been convicted of domestic violence for hitting Brad at the daycare center.  She also admitted to sending the police to Jeffers's house on the advice of her attorney.  She also said that she interpreted the divorce decree to allow her to keep the child with her on her and her new husband's birthday.  She admitted that Brad had to exchange his Easter visitation to get the child for his mother's wedding.  Jordan said she took the child to the doctor after a visitation in August and that it was the doctor who caused the investigation to be opened, not her.  She took the child back to the doctor in November 2020 because she had seen additional bruising.  Again, the doctor called DHS, and Brad was denied visitation pursuant to these renewed allegations of abuse.  Jordan admitted that none of the allegations of abuse were

5

substantiated.

¶13.    Jordan presented some text messages to rebut certain days that Brad alleged he did not have the child when, in fact, he did have her.  She also alleged that he had the child for a full week at Thanksgiving when he was only supposed to have her from Wednesday through Friday.  Brad actually took the child to Georgia at that time.  Jordan also produced checks to show that her parents paid half of the child's daycare expenses when Brad refused.  She calculated he owed $1,171.50 for those fees.

¶14.    Jordan also testified that at the time of the hearing, LCH was now five and a half and attended kindergarten at a private school in Flora.[4]  The earliest she could be dropped off at school was 7:15 a.m., but Brad's work started at 7 a.m., so on Wednesday and Thursday, Brad brought the child to her house by 6:30 a.m., and she then would take the child to school. Because of the distance from Brad's home to the school, the child has to wake up early to get there.  She gave an example of how Brad brought the child to her house at 5:30 one morning because he had to be at work even earlier.[5]  This meant he had to have left his house at 4:30 a.m. Jordan said the child was often not bathed and irritable.  Jordan explained that the mid-week visitation was not working now since the child was no longer in daycare but in school.  Jordan also testified that the child got out of school at 1:50 p.m., but Brad did not get off work until 4:00 p.m.  So she would pick up the child and often drive halfway to meet Brad somewhere to help him out.  Jordan also testified that the GAL recommended co-

---

[4]  Brad and Jordan had discussed where the child would go to school.  He agreed to let her attend private school, and Jordan agreed to pay the tuition.

[5]  During his testimony, Brad denied this.

parenting counseling, which Jordan attended but Brad did not. Jordan said she went to ten to twenty sessions. Brad went to only one. She said that it had helped her develop from how she used to act when they first were divorced. Jordan said she would let Brad know about the child's activities, like the plays she has been in, her participation as a Rebelette at football games, and her activity in the Christmas parade.

¶15. At the time of the hearing, Brad was living in Brandon. He testified that when he erroneously claimed the child for tax purposes in 2019, which was not his year for doing so, he paid Jordan back the $1,000 he received in a tax credit. He said he also paid off her Chase credit card bill of $1,150 that she was supposed to have paid according to the divorce decree. Brad further testified about times when Jordan had sent the police to his or his parents' house, supposedly to check on the child. One time, the police actually made Brad wake the child up so they could personally see that she was all right. Brad also testified that one day, August 17, 2021, Jordan called seventeen times at 6:02 p.m., one time at 6:03 p.m., and fourteen times at 6:15 p.m. This multiple calling also happened frequently and at different times during the day, although he said it was a little better since she hired her attorneys. Brad testified about the days he was refused visitation and how, at one time, when he texted and asked to pick up the child, Jordan did not respond for forty-five minutes and then said that because he did not pick her up within the prescribed thirty-minute window, he had forfeited his visitation. Brad wanted to continue the midweek visitation but pointed out that it would be better for him if he could pick up the child directly from school mid-week, rather than wait until 6 p.m. Also, it would help if his new wife could pick up the child instead of

7

having to get Jordan's agreement by virtue of the "right of first refusal" provision. Brad asked the court for make-up time for all his missed visitation, to hold Jordan in contempt, and to pay his attorney's fee of $15,167.06.

¶16. The GAL Kate Eidt also testified. She said she was appointed at the initial allegation of abuse. Although the abuse was not substantiated, Eidt reviewed the pleadings and interviewed the parties. In the interim, there was a second allegation of abuse that was also unsubstantiated. Eidt said that she did not include an *Albright* analysis in her report because there was not enough evidence to substantiate a material change in circumstances to warrant a change in custody.

¶17. After taking testimony, the court narrowed the issues and ruled. The court noted that the parties agreed the provision about the right of first refusal was unworkable and should be removed, as well as the FaceTime provision. Accordingly, the court granted the parties' request that those provisions be eliminated. The court reviewed how the reports of abuse came to be made and concluded that Brad had been deprived of visitation that should be made up. The best block of time to do that was in the summer. The court did not eliminate the midweek visitation but instructed the parties that they needed to modify it to drop the child off and pick her up at school, which could be done by the step-parents as well. The court also struck the requirement that if one of the parties was working then the other was entitled to keep the child. The court found Jordan in contempt for refusing two days of visitation, not for any days missed due to the non-contact order. The court ordered Brad to pay $1,117.50 in past-due childcare expenses. The court asked the attorneys to address the

8

issue of attorney's fees after the hearing.

*Post-Hearing Motions*

¶18.    Although the hearing was concluded in March 2022, no written order was issued, and the parties continued under the initial visitation schedule, which included midweek visitation as previously handled.  On May 27, 2022, Brad filed a third motion for contempt, alleging, among other things, that Jordan had refused him visitation because it was Jordan's (not the child's) birthday.  In response, Jordan filed a motion for entry of an order from the March 2022 hearing and for an increase in child support.  Jordan, her husband, and LCH then moved to Yazoo City, and Brad filed another motion for contempt.  On June 2, 2022, Brad filed a document entitled "Missed Visitation Days" in which he stated he had lost 40.71 days of visitation due to the no contact orders and 8.25 days due to Jordan's interference (i.e., "contempt days") for a total of 48.96 days of lost visitation. Neither of these new motions was heard in 2022, and at the end of the year, the chancellor who had tried the matter in March retired.  On January 31, 2023, the chancellor entered an agreed order setting the motions for hearing on May 22 and 24, 2023.

*May 22, 2023 Hearing*

¶19.    The parties met with the newly assigned chancellor as scheduled to secure a written order of the court's ruling from the March 9, 2022 hearing and for a hearing on the motions that had been filed since.  The transcript of the proceeding on May 22, 2023, contains a discussion between the attorneys and the court.  The court had apparently held a conference with the attorneys in chambers before going on the record.  The parties announced that they

9

had reached a tentative agreement on all issues except summer visitation. It had been proposed that Brad have visitation for June and July, but Jordan wanted at least two weeks for herself. The court told the parties that, overall, the non-custodial parent does not usually have a child during the year as much as the parent with custody. That is why the court normally gives more visitation to the non-custodial parent in the summer. The court indicated that it had read the pleadings and that the proposed summer visitation with Brad would likely be the court's ruling. Jordan's attorney objected, arguing that because Brad would have LCH for nearly half the year, the court was, in essence, modifying the custody provision and changing it from sole physical custody with Jordan to joint physical custody under the guise of modifying visitation. In response, the court stated that it had a duty to do what was in the best interest of the child and that the best interest of LCH was to allow her to have both parents in her life. The chancery court indicated that it would likely rule that Brad would have the two months' visitation in the summer. Jordan's attorney then asked to be allowed to call Jordan to the stand to put on the record what evidence she would have submitted. Although Brad's attorney responded, the court did not rule on the request and the transcript of that proceeding ends with no final order concerning visitation or resolution of Jordan's request to make an offer of proof.

¶20. The hearing was adjourned, and between May 22 and May 24, 2023, the attorneys drafted an order from the transcript of the March 9-10, 2022 hearing.

*May 24, 2023 Hearing*

¶21. On May 24, 2023, the parties again met with the chancellor, and she signed the order,

nunc pro tunc, that the parties had drafted from the March 2022 bench ruling. The court then proceeded to hear testimony from both sides on the issue of visitation, allowing each side one hour to present its proof. During the hearing, the court made it clear that, despite any prior comments, it had not made a final decision on the issue, stating during Jordan's testimony:

> Court: The Court, this Court, this new sitting Judge has not entered any orders in this matter yet. The only order that this Judge has signed is the order of my predecessor that was not entered prior to her retirement because the attorneys did not provide the order to her. And so it is my job as the highest officer of this court to help the parties come to an agreement. If maybe, I can make recommendations. My recommendations are not orders.
>
> Jordan: I understand that, yes, ma'am.
>
> Court: And you are free to say yes or no to the Court's recommendation. You have stated no. The court has offered this day to hear this case regarding visitation and then the court will make a necessary ruling according to the law governing this issue, this issue being visitation.

¶22. Jordan testified that she was a stay-at-home mom who lived in Yazoo City with her husband and two children. LCH was now seven years old and went to a private school in Yazoo City. Because Brad still had weekly midweek visitation, Jordan testified how she would have to get Jordan ready for school because Brad would bring her on Thursday morning, unbathed and hair not combed. Then on Thursday night, LCH would be exhausted. Jordan further testified that although Brad said he could get the child to school and pick her up on time, she had incurred $200 in fees, calculated at $10 per day, for early check-in or late pick-up.

¶23. When Jordan started to be questioned about the visitation plan the chancellor had

proposed, the court stopped her and clarified that "the issue is whether the visitation currently in place is working, not the court's recommendation, which is not in any order yet." Jordan continued that LCH's grades were negatively affected because she was falling asleep in class. But Jordan also said she and the teacher worked on this, and the child had since been on the "A" honor roll. She also said that Brad failed to exercise his midweek visitation about half the time in the last school year. Jordan asked the court to do away with the midweek visitation but give Brad make-up days during spring break or the holidays. She agreed with Brad having as much time with the child as the court allowed, but she felt what was being proposed, that Brad have the child all summer, was not fair. She gave no other reason for needing visitation during the summer months other than wanting to have the child a week before school to get her ready.

¶24. Brad testified that the current summer visitation was difficult because he had to give the child to Jordan while he was at work because they were still functioning under the "right of first refusal" provision. Brad did not object to eliminating the weekly midweek visitation as long as he could make it up. He said he would agree to visitation from Wednesday through Sunday every other weekend as long as he could pick the child up and drop the child off at school. He said he did not mind paying the after-school or early drop-off fees that he often incurred because he could not get the child until 6 p.m. He also pointed out that he had a stepdaughter near LCH's age who had to get up early to get to the school bus by 6:55 a.m. So once that child got on the way to school, Brad would leave to take LCH to school in Yazoo City. Although he technically started work at 7:00, he was a supervisor, and his work

hours were flexible. Brad also said that he and Jordan had agreed to the increase in his child support obligation to $530 per month.[6]

¶25.    After hearing testimony, the court noted that the parties had reached some agreements, such as abolishing midweek visitation and the "right of first refusal" provision. The sole contested issue that remained was the extent of Brad's visitation. To modify visitation, the court stated, a party must show only that the visitation order is not working and that it is in the child's best interest to modify it. The court noted that the previous chancellor had found that Jordan interfered with visitation and found that she continued to do so. The court eliminated Brad's weekly midweek visitation and ordered that Brad now have the first, third, and fifth weekends each month from Wednesday until Monday morning. He was allowed to pick up and return the child to the school. The court granted Brad visitation in the summer from June 1 through July 31, partly to make up for Brad's loss of visitation due to Jordan's interference. The court granted Jordan visitation with LCH from 4 p.m. on the child's birthday in June through the following Monday, and from July 4 from 4 p.m. through the following Monday.[7] During times the child was not in school, the parties would exchange the child at a Burger King on Hwy 49 in Jackson. The court also allowed Brad to use after-school care if he could not promptly pick up the child or drop her off early if needed, but he needed to pay the fees. Both parties were ordered to provide uniforms for the child. The court order approved the agreed-upon increase in child support to $530 per month but

_____

[6] Brad's income had increased to $59,000 per year.

[7] The duration of this visitation varied from five to eleven days, depending on which days of the week the child's birthday and July 4 fell.

13

provided that it not begin until August 2023.

¶26. After the ruling, Jordan's attorney said he desired to make an offer of proof, which he stated would have included all the evidence that he would have submitted had they had a four-day trial:

> I had made a procedure motion on Monday to be able to make an offer of proof of all of the evidence that we had wanted to put in the record, and I appreciate that we've had the time that we've had, but I don't know if the Court will let me do that or not, but I just renew that motion.

The court responded that the hearing that day was the opportunity to do so.[8] However, Jordan's attorney did not specify what evidence or testimony he would have included or what it would have shown. The court noted his request and stated that they did not need four days to talk about the sole issue of visitation.

¶27. On May 24, 2023, the court entered a written order modifying the divorce judgment and agreement. Brad was granted weekend visitation from Wednesday after school until the following Monday for the first and third (and, if applicable, the fifth) Wednesdays of the month. Additional visitation was granted when the child turned ten. In the summer, Brad had visitation for the months of June and July. Jordan was given visitation from 4 p.m on the child's birthday until the following Monday and for a week beginning the Fourth of July. The court also gave Brad visitation from 4 p.m. on May 26, 2023, through 4 p.m. on Memorial Day. Brad was ordered to pay any after-school care fees, lunch or early bird drop off fees he incurred, and both parties were ordered to purchase uniforms for the child. The

---

[8] Although the parties anticipated a four-day trial when the matter was set for hearing in January 2023, clearly that amount of time was no longer necessary because the parties had resolved all matters except for summer visitation.

14

court modified the child support obligation from $300 to $530 per month beginning in August. The court denied any request for contempt. The court also denied Jordan's motion to make an offer of proof of evidence. The court awarded Jordan $1,117.50 in childcare payments.

¶28. Jordan appealed and raises four issues: whether Jordan was deprived of a fair trial when the chancery court allegedly decided the case before trial began; whether the chancery court made a de facto award of custody to Brad that was not supported by the evidence; whether substantial evidence in the record supports the chancery court's order concerning custody and visitation; and whether the chancery court committed reversible error by refusing to allow Jordan to make an offer of proof.

¶29. In response, Brad argues that Jordan waived the right to appeal certain issues because she failed to object during the trial or file a post-trial motion for reconsideration, that the court properly dealt with visitation issue, which did not change the custody of the child and was in the best interest of the child, that the chancery court did not err by refusing to allow Jordan to use several days to make a proffer, and that the chancery court did not make its decision based on bias, prejudice or a "bent" against Jordan.

**Standard of Review**

¶30. "In domestic relations cases, our standard of review is limited." *Weatherly v. Weatherly*, No. 2022-CA-00804-COA, 2024 WL 2010429, at *4 (¶18) (Miss. Ct. App. May 7, 2024), *motion for reh'g filed* (June 4, 2024); *accord May v. May*, 107 So. 3d 1052, 1053 (¶4) (Miss. Ct. App. 2013) (citing *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512

15

(¶8) (Miss. 2010)).  "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Wilburn v. Wilburn*, 991 So. 2d 1185, 1190 (¶10) (Miss. 2008).  "To obtain a change to the visitation schedule, the moving party need only show that the current visitation schedule is not working and that it would be in the best interest of the child to change the visitation schedule."  *Jones v. McQuage*, 932 So. 2d 846, 848 (¶9) (Miss. Ct. App. 2006) (citing *Cox v. Moulds*, 490 So. 2d 866, 869 (Miss. 1986)).

### Discussion

### I.     Whether Jordan waived certain issues on appeal.

¶31.    Brad argues that Jordan failed to raise "virtually all" of her issues before the chancery court, either at trial or in a motion for reconsideration, and thus, they are waived on appeal.[9] However, it is clear from the record that Jordan did raise the issues of visitation and her attempt at a proffer to the court, so those issues are not waived.  What Jordan did not raise to the chancery court was her claim that the chancellor denied her a fair trial.

¶32.    "It is well settled that issues not raised below may not be raised on appeal." *Harrison*

---

[9]  Brad agrees that the law does not require Jordan to file a post-trial motion for reconsideration if the issue has been raised and decided by the trial court during the trial. *Thompson v. Thompson*, 380 So. 3d 945, 957 (¶48) (Miss. Ct. App. 2024) ("Mississippi law plainly provides that a party is not required to file a post-trial motion in chancery court in order to appeal the chancery court's judgment."); *Kiddy v. Lipscomb*, 628 So. 2d 1355, 1359-60 (Miss. 1993) ("[A] motion for a new trial is only necessary to bring to the attention of the trial court matters not embraced in the rulings during the trial.").  Brad argues, however, that Jordan did not raise certain issues during the trial, and, thus, they can only be considered on appeal if Jordan had filed a motion to reconsider, which she did not.

*v. Howard*, 356 So. 3d 1232, 1246 (¶45) (Miss. Ct. App. 2023). "Before an issue may be assigned and argued in this Court, it must first be presented to the trial court." *Id*. (citing *Williams v. Dep't of Hum. Servs*., 116 So. 3d 176, 181 (¶12) (Miss. Ct. App. 2013) (citing *Wilburn*, 991 So. 2d at 1191 (¶14)). We cannot find error when an issue was not properly before the trial court. *Kelley v. Day*, 965 So. 2d 749, 755 (¶12) (Miss. Ct. App. 2007); *see also Whiddon v. State*, No. 2022-KA-00616-COA, 2024 WL 1871944, at *14 (¶71) (Miss. Ct. App. Apr. 30, 2024) (failure to object to a trial court's allegedly improper comments at trial will waive the issue on appeal), *reh'g denied* (Miss. Ct. App. Sept. 17, 2024).

¶33.     In this case, Jordan argues that she was denied a fair trial because in May 22, 2023, the chancellor had heard the positions of the parties in chambers and had an initial idea of what a fair ruling would be. If Jordan felt that the trial court was biased and denied her due process, then Jordan should have asked the chancellor to recuse at that time. Jordan had a second opportunity to request recusal at the start of the hearing on May 24, 2023. Because she did not, the issue of unfair bias was never put before the court, and on appeal Jordan is procedurally barred from raising that issue.

¶34.     Jordan's reliance on *Wal-Mart Stores Inc. v. Frierson*, 818 So. 2d 1135 (Miss. 2002), is misplaced. In that case, Wal-Mart made no objection when the trial court cited as precedent a reported case that involved the trial judge's mother. *Id*. at 1140-41 (¶¶9, 10). Nor did Wal-Mart request a recusal. *Id*. On appeal, the Supreme Court still noted that a litigant is required to make a timely objection to preserve a matter on appeal. *Id*. at 1141 (¶10). Despite the party's failure to preserve the issue, the Supreme Court decided to discuss

17

the issue to make several points. *Id*. at (¶12). The Court noted that "a presumption of impartiality exists that a judge, sworn to administer impartial justice, is qualified and unbiased." *Id*. The Court found that Wal-Mart had not demonstrated that the trial court's ruling was the result of actual bias or prejudice. *Id.* Further, the Supreme Court cited cases where appellate courts have upheld the trial judge's decision not to recuse, even when considering the testimony of an expert who had testified against the trial court when he was an attorney. *Id.* at 1142 (¶¶12-13).

¶35. Notwithstanding Jordan's waiver of this issue, we reiterate the presumption that a trial court administers its duties without bias. "[I]n viewing all circumstances, recusal is required only where the judge's conduct would lead a reasonable person, knowing all the circumstances, to conclude that the prejudice is of such a degree that it adversely affects the client." *Miss. United Methodist Conf. v. Brown*, 929 So. 2d 907, 909 (¶6) (Miss. 2006). In *United Methodist*, the circuit court judge had provided the plaintiff a copy of its in camera order and documents four hours before opposing counsel received them. *Id*. at (¶8). Further, from the circuit court's comments in that case, it appeared clear to the Mississippi Supreme Court that the trial court had assumed the position of advocate for the plaintiff. *Id*. at 911 (¶14).

¶36. In this case, the chancery court made it very clear in the hearing on May 24, 2023, that it had not pre-decided the visitation issue and that it was holding the hearing so that both sides could present their positions and proof. The trial court showed no actual bias against

18

Jordan personally or against her attorney.[10] "A trial judge will not be found to be biased just because a defendant does not agree with a judge's ruling." *Carlson v. City of Ridgeland*, 131 So. 3d 1220, 1225 (¶20) (Miss. Ct. App. 2013). Moreover, the court's general opinion concerning the need for both custodial and non-custodial parents to have as much time with their child was consistent with the parties' own intent, as shown in the visitation schedule they initially established. Accordingly, we find that notwithstanding the procedural bar, Jordan has not presented sufficient proof to rebut the presumption of judicial fairness in this case.

## II. Whether the chancery court erroneously modified custody under the guise of a change in visitation.

¶37. Jordan argues that the chancery court impermissibly modified the physical custody provisions of the divorce decree, awarding custody to Brad de facto, without a showing of a material change in the circumstances of the parties adversely affecting the child.

¶38. The Mississippi Supreme Court has stated that visitation is a matter within the discretion of the chancery court:

> Visitation and restrictions placed upon it are within the discretion of the chancery court. *Newsom v. Newsom*, 557 So. 2d 511, 517 (Miss. 1990); *Clark v. Myrick*, 523 So. 2d 79, 83 (Miss. 1988); *Cheek v. Ricker*, 431 So. 2d 1139, 1146 (Miss. 1983). Where a chancellor has made factual findings on the matter of visitation, this Court will not disturb those findings unless [the chancellor's] findings are not supported by substantial credible evidence, [the chancellor] has committed manifest error, or [the chancellor] has applied the erroneous legal standard. *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss.

---

[10] *See Washington Mut. Fin. Grp. LLC v. Blackmon*, 925 So. 2d 780, 791 (¶41) (Miss. 2004) ("[A]nimosity toward attorneys representing clients will in only the most extreme situations be found to be of a quality and degree which will suggest that a judge is biased against the parties represented by those attorneys.").

1997).  However, while being attentive to the rights of a non-custodial parent, [the chancellor] must keep the best interest of the child as [the] paramount concern. *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994).

*Gerty v. Gerty*, 296 So. 3d 704, 709 (¶13) (Miss. 2020).  In addition, "the law is well settled that a chancellor has great discretion in making a determination of what is in the best interest of the child as it relates to visitation issues."  *Witters v. Witters*, 864 So. 2d 999, 1002 (¶11) (Miss. Ct. App. 2004).  In subsequent proceedings concerning a change in visitation, all that needs to be shown is that there is a prior decree providing for reasonable visitation rights that is not working and that it is in the best interests of the children that specific, workable visitation be set.  *Cox*, 490 So. 2d at 869.

¶39.    In the case at hand, Brad withdrew his request for a change in custody and both he and Jordan agreed that the current visitation schedule that they had established was not working. Both agreed to eliminate the "first right of refusal" provision and allow the step-parents to care for and pick up the child.  Moreover, both agreed that weekly midweek visitation was not best for the child or workable given the distance between Brad's home and the child's school.  Neither party disagreed with extending Brad's weekend visitation.  What they could not agree upon was the summer visitation.  We have noted that in situations where the parents cannot agree on visitation rights, the court must step in to define and fix those rights. *Brown v. Gillespie*, 465 So. 2d 1046, 1049 (Miss. 1985).  In this case, the court did just that, and we find no abuse of its discretion in setting the summer visitation as it did.  Brad was given visitation with the child from June 1 to July 31, which meant Jordan has the child from the end of the school year in May to June 1.  In addition, the chancery court gave Jordan

20

several days of visitation in June for the child's birthday and several days in July for the Fourth of July holiday.[11] So Jordan did have some visitation with the child in the summer. We note, again, that the overall visitation provided to Brad does not deviate from the parties' original intent to share time with the child almost equally.

¶40. Jordan argues that the divorce awarded her sole physical custody and that what the chancery court did was modify custody without finding a material change in circumstances adversely affecting the child. Although Jordan cites several modification-of-custody cases that establish the criteria for a modification of custody, none deal with facts similar to this case. Here, the original divorce decree and separation agreement *that Jordan agreed to* gave Brad about the same amount of visitation that the court awarded. From the beginning, despite agreeing that Jordan had physical custody, the parties also agreed that Brad would nonetheless have the child in his care nearly half of the time. The chancery court did not change custody; it merely modified a visitation arrangement that was consistent with the visitation the parties had originally intended—a visitation that would work better given the parties' change in location and work schedules.

### III. Whether there was substantial evidence to support the chancery court's findings.

¶41. "This Court will not disturb a chancellor's findings of fact unless such findings are manifestly wrong or unsupported by substantial credible evidence." *R.L.N. v. C.P.N.*, 931 So. 2d 620, 624 (¶12) (Miss. Ct. App. 2005). "Substantial evidence" has been defined as

---

[11] The parties agreed that the duration of this visitation depends on which days of the week the child's birthday and July 4 fall.

"such relevant evidence as reasonable minds might accept as adequate to support a conclusion or to put it simply, more than a 'mere scintilla' of evidence." *Id*. (citing *Tucker v. Prisock*, 791 So. 2d 190, 192 (¶11) (Miss. 2001)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Scott v. Boudreau*, 375 So. 3d 688, 692 (¶14) (Miss. Ct. App. 2023).

¶42. In this case, the issue was not complex. It was simply whether the parties' current visitation schedule was working and whether a revised schedule would serve the child's best interests. Moreover, both parties agreed that the current visitation schedule was not working and that it would be best for the child and the parties to revise it. Both parties agreed that weekly midweek visitation (Tuesday through Thursday) was not working, and the proof substantiated this reality. Jordan voiced no objection to Brad having extended weekend visitation from Thursday through Monday mornings three times a month. Prior to the hearing, Jordan and Brad's attorneys represented to the court that the only disagreement between the parties was the summer visitation. Jordan even agreed that it was best for the child that LCH have as much visitation with Brad as possible.

¶43. On appeal, Jordan contends that there was insufficient evidence in the record concerning the court's reasons for the change in visitation, which she identifies as the child's age and the distance between the parties' residences, as well as the need to decrease the tension between the parties and reimburse Brad for time lost. However, the record clearly

22

contains sufficient evidence on each of these issues.

¶44.    The record contains in excess of 100 email exchanges that reflected the contention between the parties that the court sought to reduce. For example, according to the divorce judgment in effect, Brad could not pick up the child until 6 p.m. However, when he asked to pick the child up earlier because he got off work at 4 p.m., Jordan insisted that something had come up or that she had to get the child's clothes ready, so he could not get her until 6 p.m. Such inflexibility obviously caused tension between the parties, if not proof of obstruction of visitation, that the court sought to lessen. Jordan also admitted that she did not disagree with the prior chancery court's finding in the March 2022 hearing that she had intentionally interfered with Brad's visitation time. The record clearly shows months of visitation lost due to Jordan's unsubstantiated allegations of child abuse.

¶45.    In addition, the chancery court's change in Brad's visitation was supported by the evidence in the record as well. First, it was consistent with the original intent of the parties in their settlement agreement to share time with the child as much as possible. In their original property settlement agreement, Brad had weekend visitation twice a month *and* mid-week visitation *every* week. Depending on how one calculates this visitation time,[12] it is clear that the parties intended from the beginning to share physical custody nearly fifty

---

[12]    Counting the days based on where the child spends the night, e.g., mid-week visitation from Tuesday evening through Thursday morning would be counted as two days, under the original judgment, Brad had the child about 183 days per year (sixty-nine days for weekends, eighty-six days for mid-week, and twenty eight days for the summer).

percent of the time. Under the revised visitation schedule, Brad actually has less visitation.[13]

Second, the chancery court's visitation schedule for the summer compensated Brad for the loss of visitation that was established by evidence in the record. With weekly mid-week visitation eliminated, Brad would have eight to twelve days per month (depending on how the days are calculated) with the child, even with the extended visitation, as opposed to the twelve days he previously had. In addition, Brad had lost visitation days because of the no-contact orders and Jordan's established interference. Thus, the chancery court's increase of visitation in the summer to compensate him for that lost time was supported by substantial evidence in the record.

> **IV.    Whether the chancery court erred in denying Jordan's request to make a proffer**.

¶46.    At the May 22, 2023 bench conference, when it appeared that the court may have made a ruling on the visitation issue, Jordan's attorney asked to make an offer of proof "that would consist of putting my client on the witness stand for a number of hours, and just going through what would have been her direct examination during the trial." There was no resolution that day, either of the entry of a final judgment on visitation or on Jordan's request to make a proffer.

¶47.    When court proceedings reconvened on May 24, 2023, the landscape had changed. The court indicated that it had not decided the visitation issue and that it would hear

---

[13] Using the same method of calculation, in the revised visitation schedule, Brad had the child about 165 to 171 days per year (fifty to fifty-six days in the summer (not counting the five to eleven days that Jordan would have the child) and 115 days in extended-weekend visitation during the school year).

testimony from the parties, but for a limited time from each. Both parties testified, and the court made its ruling. Thereafter, Jordan's attorney renewed her request to make an offer of proof, but he did not specify what that proof was, stating only that he wanted to make an offer "of all of the evidence that we had wanted to put in the record." The court duly noted Jordan's request; however, her attorney did not articulate the proof that he wanted to present. In its judgment, the court denied Jordan's motion to proffer. On appeal, Jordan contends that the chancery court refused to allow her to make an offer of proof at the end of the May 24, 2023 hearing, which she contends constituted reversible error.

¶48.    We have held that "when testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Evans v. State*, 294 So. 3d 664, 667 (¶12) (Miss. Ct. App. 2020) (citing *Davis v. State*, 130 So. 3d 1141, 1150 (¶32) (Miss. Ct. App. 2013)). Making a proffer is not complicated; all a party needs to do is place in the record sufficient information of what would have been presented and what that proof would have established.

> While the standard for effecting a proffer is a rather low threshold, a party is still required to dictate into the record what the appellant desired to show by the testimony and by the evidence. Doing so officially indicates to this Court the purpose of the evidence. However, where a party fails to place into the record the substance of the evidence he would have offered had the court ruled otherwise, and the purpose of the evidence was not "apparent from the context," the reviewing court is unable to review the decision to exclude the evidence.

*Clarksdale Pub. Utils. Comm'n v. Miss. Dep't of Emp. Sec.*, No. 2022-CC-01085-COA, 2024 WL 567740, at *14 (¶61) (Miss. Ct. App. Feb. 13, 2024) (citations and internal quotation marks omitted), *cert. dismissed as untimely* (Miss. Sept. 5, 2024).

25

¶49. Although refusing to allow a party to make a proffer at all is reversible error, *Dille v. State*, 334 So. 3d 1162, 1180 (¶46) (Miss. Ct. App. 2021), in this case, the court did not prohibit Jordan from testifying or presenting the evidence on the issue of visitation during the time allotted to her. Nor did the court prohibit Jordan's attorney from articulating what additional evidence he had to present. For example, Jordan contends she was foreclosed from testifying about summer visitation.[14] An offer of proof on that topic could have included a summary of any testimony about why she needed additional visitation in the summer or about some need the child had to have more visitation with Jordan during the eight weeks in the summer. But Jordan proffered no specific summary of the testimony she would have given that the court had excluded. "The Mississippi Supreme Court has underscored the need for a full proffer on the record so that the appellate court can properly evaluate the propriety of a trial court's exclusion of evidence." *Id*. at (¶45). In this case, we do not know what Jordan intended to present, so we cannot evaluate the chancery court's rulings. Because the chancery court did not prohibit Jordan from making a proffer and because Jordan failed to make a proper offer of proof, we find no merit to this issue.

**Conclusion**

¶50. Because she failed to request the chancellor to recuse or raise the issue in a post-trial motion, Jordan waived her claims of denial of due process and the lack of a fair trial on appeal. Further, because Brad withdrew his request for a change in custody, the chancery

---

[14] We noted that during the May 22, 2023 bench conference, the attorneys and the court discussed the child's summer activities at length, so the court was informed about those activities.

court merely decided whether the visitation in place was working. The chancery court's order did not make a change in custody requiring a showing of a material change in circumstances adversely affecting the child. Further the record contains substantial evidence to support the chancery court's order. Finally, the chancery court did not refuse Jordan the right to make an offer of proof, and Jordan's failure to make a proper proffer precludes our review for any erroneous exclusion of evidence by the chancery court. Accordingly, finding no error, we affirm the judgment of the chancery court.

¶51. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., NOT PARTICIPATING.**